WILLIAM C. WILLIAMS, ALANSON SHELEY, AND ALANSON
SHELEY BROOKS v. JACOB S. FARRAND, RICHARD
P. WILLIAMS, HARVEY C. CLARK, AND
JACOB S. FARRAND, JR.

*Partnership—Dissolution—Rights of retiring and continuing part-
ners—Firm name—Good-will—Trade-marks.*

1. The following propositions must be regarded as established by
the clear weight of authority:

*a*—Though a retiring partner may have assigned his interest
in the partnership business, including its good-will, to his co-
partner, he may, in the absence of an express agreement to the
contrary, engage in the same line of business in the same
locality, and in his own name.

*b*—He may, by newspaper advertisements, cards, and general
circulars, invite the general public to trade with him, and
through the same mediums may advertise his long connection
with the old business, and his retirement therefrom.

*c*—He will not be allowed, however, to use his own name, or
to advertise his business, in such a way as to lead the public
to suppose that he is continuing the old business; hence he will
not be allowed to advertise himself as its successor.

*d*—The purchaser will not, in the absence of an express
agreement, be allowed to continue the business in the name of
the old firm.

*e*—No man has a right to sell or advertise his own business
or goods as those of another, and so mislead the public, and
injure the business of such other person.

*f*—When an express contract has been made to remain out
of business, or for the use by the purchaser of a fictitious name,
or a trade-name, or a trade-mark, the courts will enjoin its
continued violation; citing *Beal v. Chase*, 31 Mich. 490; *Doty
v. Martin*, 32 Id. 462; *Grow v. Seligman*, 47 Id. 607.

*g*—An assignment of all the stock, property, and effects of a
business, or the exclusive right to manufacture a given article,
carries with it the exclusive right to use a fictitious name in
which such business has been carried on, and such trade-marks
and trade-names as have been in use in such business. These
incidents attach to the business or right of manufacture, and
pass with it.

*h*—A corporate name is regarded as in the nature of a trade-mark, even though composed of individual names, and its simulation may be restrained.

2. The doctrine that a retiring partner, who has conveyed his interest in an established business, whether the good-will be included or not, cannot personally solicit the customers of the old firm, has no support in principle.

3. The rule that upon the dissolution of a firm neither partner has the right to use the old firm name, as well as the other rule that a retiring partner has no right to use it, are subject to the exception that a person has the right to use his own name unless he has expressly covenanted otherwise.

4. Complainants have, under the authorities cited, an undoubted right to protection in the proprietary rights acquired by the old firm, and in the use of such trade-marks as were in use by the old firm, and defendants have no right so to imitate the labels in use by the old firm as to convey the belief that the goods labeled are. from the old house. The use, however, of the words, "Sold by Farrand, Williams & Co.," or "Prepared by Farrand, Williams & Co.," upon a label, will not be protected as a trade-mark or trade-name, and the right to use the name in that connection did not pass under the bill of sale set forth in the opinion.

5. The following propositions are summarized from the opinion of Mr. Justice MCGRATH:

*a*—Good-will may be said to be those intangible advantages or incidents which are impersonal, so far as the grantor is concerned, and attach to the thing conveyed.

*b*—Where good-will consists of the advantages of location, it follows an assignment of the lease of that location. Again, it may not depend at all upon location, as in the case of a newspaper, and it would follow an assignment of all interest in the plant, property, effects, and business.

*c*—A partnership name may become impersonal after the death of the partners, and it is then treated like a fictitious or corporate name.

*d*—A surname may become impersonal when it is attached to an article of manufacture, and becomes the name by which such article is known in the market, and the right to use the name may in consequence follow a grant of the right to manufacture that article, or a sale of the business of its manufacture; and when the right to manufacture is exclusive, the right to use the name as applied to the article becomes likewise exclusive.

Appeal from Wayne. (Reilly, J.) Argued February 12, 1891. Decided November 20, 1891.

Bill to restrain the defendants from using any combination of the names Farrand and Williams as part of their firm name. Complainants appeal. Decree dismissing bill affirmed. The facts are stated in the opinions.

*William H. Wells* (*Ashley Pond, Bowen, Douglas & Whiting*, of counsel), for complainants.

*Moore & Canfield* (*F. H. Canfield* and *H. H. Swan*, of counsel), for defendants.

[The points and authorities of the respective counsel are so fully stated and reviewed in the opinions that a further statement is omitted.—REPORTER.]

McGRATH, J. Complainants and defendants had been for some years engaged as wholesale druggists on Larned street east, in the city of Detroit, as copartners, under the name and style of Farrand, Williams & Co. There were no articles of copartnership, and no term fixed for which the partnership was to continue.

Prior to the taking of the annual inventory in January, 1890, defendant Jacob S. Farrand expressed to complainant Sheley a desire to dissolve the copartnership. Mr. Sheley declined to say anything until the annual inventory should be taken, and the business of the year settled up. On the 25th of January, 1890, after the completion of the inventory, defendants made a proposition in writing to—

"Pay Messrs. Sheley & Brooks, for their interest in the firm of Farrand, Williams & Co., the amount of their interest being fifty thousand dollars ($50,000), the sum of sixty thousand dollars ($60,000), or they will take for their interest, the amount being one hundred thousand dollars ($100,000), the sum of one hundred and twenty

thousand dollars ($120,000), the same to be paid in cash, or in notes acceptable to the parties who sell, one week from to-day, Saturday, the first day of February next; the store to be leased to the party purchasing for a term of five years at a rent of eight thousand dollars ($8,000) a year, and the warehouse to be rented to the party purchasing at a net rental of 6 per cent. a year on the cost of their interest therein."

On the following Monday Mr. Sheley accepted defendants' offer to sell, and on the 1st day of February following a bill of sale was prepared, reciting, among other things, that defendants, in consideration of the sum of $120,000, paid to them by Alanson Sheley, party of the second part,—

"Have bargained and sold unto the said party of the second part * * * all our right, title, and interest to the within-mentioned resources of said firm, including the good-will attendant upon the business."

This bill of sale was not executed, objection being made to the clause, "including the good-will attendant upon the business;" and a new instrument was prepared, reciting that defendants, parties of the first part,—

"For and in consideration of the sum of one hundred and twenty thousand dollars, * * * to them paid by Alanson Sheley, * * * of the second part, * * * have bargained and sold, and by these presents do grant and convey, unto the said party of the second part, his executors, administrators, or assigns, all our right, title, and interest in the firm of Farrand, Williams & Company."

This instrument was executed, the insurance policies were assigned by Farrand, Williams & Co. to Williams, Sheley & Brooks, and an agreement to assume and pay all the debts of the old firm was executed by Williams, Sheley & Brooks, and delivered to defendants.

Defendants afterwards formed a copartnership under the firm name of Farrand, Williams & Clark, and opened a wholesale drug establishment at No. 32 Woodward

avenue. Complainants adopted the name and style of Williams, Sheley & Brooks; posted their firm name, as successors to Farrand, Williams & Co., over their place of business; had the words ."Williams, Sheley & Brooks, Successors to" printed in red ink over the words "Farrand, Williams & Co." wherever the latter appeared upon letter-heads, bill-heads, labels, and other stationery; advertised themselves in the newspapers and trade journals as Williams, Sheley & Brooks, successors to Farrand, Williams & Co.; and sent out circulars to the trade containing not only their firm name, but the names of the individual members of the new firm. Defendants also extensively advertised the new enterprise through the same mediums, calling special attention to the names of the members of the new firm, their long connection with the drug business, and the dissolution of the old firm, and soliciting trade.

The complainants contend that the assignment by defendants of all interest in the business carried with it the good-will of the business, and, having purchased the good-will of that business, they are entitled to the exclusive use of the old firm name; that, while defendants have the right to engage in the same line of business, they have not the right to such a collocation of their own names as will produce confusion, attract customers, and secure orders, letters, and goods intended for the old firm; that defendants have no right to simulate their labels, to solicit their customers, or entice away their employés.

"Good-will" has been defined by this Court to be—

"The favor which the management of a business has won from the public, and the probability that old customers will continue their patronage." *Chittenden v. Witbeck,* 50 Mich. 401.

Lord Eldon, in *Cruttwell v. Lye,* 17 Ves. 335, defined

it as simply the probability that old customers will resort to the old place.

The following propositions must be regarded as established by the clear weight of authority:

1. Though a retiring partner may have assigned his interest in the partnership business, including the good-will thereof, to his copartner, he may, in the absence of an express agreement to the contrary, engage in the same line of business in the same locality, and in his own name.

2. He may, by newspaper advertisements, cards, and general circulars, invite the general public to trade with him, and through the same mediums advertise his long connection with the old business, and his retirement therefrom.

3. He will not be allowed, however, to use his own name, or to advertise his business, in such a way as to lead the public to suppose that he is continuing the old business; hence, will not be allowed to advertise himself as its successor.

4. The purchaser will not, in the absence of an express agreement, be allowed to continue the business in the name of the old firm.

5. That no man has a right to sell or advertise his own business or goods as those of another, and so mislead the public, and injure such other person.

In *Myers v. Buggy Co.*, 54 Mich. 215, A., B., and C. had been carrying on business as copartners at Kalamazoo, under the name and style of "The Kalamazoo Wagon Company." A., B., and C. sold to complainant "all of their interest in the property, money, assets, and good-will," etc., in and to their business. After such sale complainant's assignors formed a corporation under the name of "The Kalamazoo Buggy Company;" pitched their plant in the same locality; commenced the manu-

facture of the same class of goods; issued circulars to the trade, with descriptive cuts of the same character and appearance as those contained in complainant's circulars, and advertised their place of business as being in the same locality. In that case the name of "The Kalamazoo Wagon Company" was an assumed name. The only distinctive feature in the name adopted by defendants was the use of a word of similar meaning to that for which it had been substituted. The defendants were not using their own names. It was a pure case of piracy, and the facts clearly indicated an intention to deceive the public. As was said in *Burgess v. Burgess,* 3 DeGex, M. & G. 896:

"Where a person is selling goods under a particular name, and another person, not having that name, is using it, it may be presumed that he so uses it to represent the goods sold by himself as the goods of the person whose name he uses; but where the defendant sells goods under his own name, and it happens that the plaintiff has the same name, it does not follow that the defendant is selling his goods as the goods of the plaintiff."

In *Lee v. Haley,* L. R. 5 Ch. App. 155, plaintiffs had been doing business at No. 22 Pall Mall, under the *artificial* name of "Guinea Coal Company." Defendant, who had been their manager, set up a rival business under the name of "Pall Mall Guinea Coal Company," at 46 Pall Mall. His envelopes and business cards were printed in such a way as to resemble the plaintiffs'.

In *Glenny v. Smith,* 2 Drew. & S. 476, defendant had been in plaintiffs' employ, and started in business on his own account. Over his shop he had his own name, Frank P. Smith, printed in large, black letters on a white ground, but on the brass plates under the windows of his shop he had engraved the word "from," in small letters, and the words "Thresher & Glenny" (the name of plaintiffs' firm) in large letters. He had an awning in front

of his shop, which, when let down, would cover his own name, and expose only the name of plaintiffs' firm. The court held that defendant was deceiving the public, and an injunction was issued. *Croft v. Day,* 7 Beav. 84; *Levy v. Walker,* 10 Ch. Div. 436; *Turton v. Turton,* 42 Id. 128; *Hookham v. Pottage,* L. R. 8 Ch. App. 91; *Meneely v. Meneely,* 62 N. Y. 431; *Fullwood v. Fullwood,* 9 Ch. Div. 176.

6. That when an express contract has been made to remain out of business, or for the use by a purchaser of a fictitious name, or a trade-name, or a trade-mark, the courts will enjoin the continued violation of such agreement.

In *Grow v. Seligman,* 47 Mich. 607, defendant had carried on the clothing business at Bay City, under the name and style of "Little Jake," and sold out to complainant, and expressly conveyed the right to use the name and style of "Little Jake," and agreed that he would not again engage in that business at Bay City, and defendant was enjoined from violating his agreement.

In *Shackle v. Baker,* 14 Ves. 468, defendant agreed that he would not, for the space of ten years, carry on or permit any other person to carry on the same business in Middlesex, London, or Westminster, and that he would use his best endeavors to assist plaintiff, and procure customers for him.

In *Hitchcock v. Coker,* 6 Adol. & E. 438, Coker had agreed to enter the services of plaintiff, and that he would not at any time thereafter engage in the business in which his employer was engaged. To the same effect are *Beal v. Chase,* 31 Mich. 490; *Doty v. Martin,* 32 Id. 462; *Burckhardt v. Burckhardt,* 36 Ohio St. 261; *Vernon v. Hallam,* 34 Ch. Div. 752; *Tode v. Gross,* 28 N. E. Rep. (N. Y. App.) 469.

7. That an assignment of all the stock, property, and

effects of a business, or the exclusive right to manufacture a given article, carries with it the exclusive right to use a fictitious name in which such business has been carried on, and such trade-marks and trade-names as have been in use in such business. These incidents attach to the business or right of manufacture, and pass with it.

Courts have uniformly held that a trade-mark has no separate existence; that there is no property in words, as detached from the thing to which they are applied; and that a conveyance of the thing to which it is attached carries with it the name. *Dixon Crucible Co. v. Guggenheim*, 2 Brewst. 321; *Lockwood v. Bostwick*, 2 Daly, 521; *Derringer v. Plate*, 29 Cal. 292.

In *Gage v. Publishing Co.*, 11 Ont. App. 402, Gage and Beatty were copartners, and, among other things, were engaged in publishing "Beatty's Headline Copy-Books." Beatty sold out to Gage all his interest in the business, and engaged in the drug business. Gage continued for some years the sale of the copy-books, when Beatty licensed defendant to publish "Beatty's New and Improved Headline Copy-Books."[1]

In *Hoxie v. Chaney*, 143 Mass. 592 (10 N. E. Rep. 713), Hoxie and Chaney were copartners, engaged in the manufacture of soaps, two brands of which were known as "Hoxie's Mineral Soap" and "Hoxie's Pumice Soap." These were simply trade-names, by which the articles were known, and the right to use them passed with the right to manufacture the articles.

In *Cement Co. v. Le Page*, 147 Mass. 206 (17 N. E. Rep. 304), Brooks and Le Page, as copartners, sold to plaintiff the good-will of their business, and the right to use their trade-marks. They were engaged in the manufacture of glues. Their light glues they named "Le

[1] See 11 Can. Sup. Ct. 306.

Page's Liquid Glues." The court held that the right to use the name by which the articles were known to the trade passed with the right to manufacture the articles.

In *Merry v. Hoopes*, 111 N. Y. 415 (18 N. E. Rep. 714), the parties were formerly partners. Hoopes sold to Merry, but afterwards undertook to use certain trade-marks, viz., the "Lion Brand" and "Phœnix Brand," but the court held that these trade-marks passed to the assignee.

In *Hall v. Barrows*, 4 De Gex, J. & S. 150, the firm had marked the chief part of their output of iron with the initial letters of their partnership name, "B. B. H.," surmounted by a crown, and the court held the letters and crown had become a trade-mark, and, as such, should be included as a subject of value. Brown, Trade-Marks, 358; *Millington v. Fox*, 3 Mylne & C. 338, 352; *Myers v. Buggy Co.*, 54 Mich. 215; *Sohier v. Johnson*, 111 Mass. 242; *Shipwright v. Clements*, 19 Wkly. Rep. 599; *Rogers v. Taintor*, 97 Mass. 291.

8. A corporate name is regarded in the nature of a trade-mark, even though composed of individual names, and its simulation may be restrained. After adoption it follows the corporation. Statutes providing for the organization of corporations usually prohibit the adoption of the same name by two companies. *Holmes v. Manufacturing Co.*, 37 Conn. 278.

These propositions are sustained by a long line of authorities, but in none of the cases cited does the question hinge upon a grant of good-will. Complainants insist, however, that a grant of good-will may be implied, and, when express or implied, it imposes certain restraints upon the vendors, viz.:

1. That they cannot afterwards personally solicit customers of the old firm.

2. That they are restricted in the use that may be made of their own names.

1. The doctrine that a retiring partner, who has conveyed his interest in an established business, whether the good-will be included or not, cannot personally solicit the customers of the old firm, has no support in principle. A retiring partner conveys, in addition to his interest in the tangible effects, simply the advantages that an established business possesses over a new enterprise. The old business is an assured success, the new an experiment. The old business is a going business, and produces its accustomed profits on the day after the transfer. It is capital already invested, and earning profits. The continuing partner gets these advantages. The new business must be built up. The capital taken out of the old concern will earn nothing for months, and in all probability the first year's business will show loss instead of profit. For a time at least it is capital awaiting investment, or invested, but earning nothing. The retiring partner takes these chances or disadvantages. He does not agree that the benefit derived from his connection with that business shall continue. He does not agree that the old business shall continue to have the benefit of his name, reputation, or service; nor does he guarantee the continuance of that patronage which may have been attracted by his name or reputation. He does not pledge a continuance of conditions. He takes out of the business an element that has contributed to the success of that business. He sells only those advantages and incidents which attach to the property and location, rather than those which attach to the person of the vendor. T. Pars. Partn. 409. He sells only so much of the custom as will continue in spite of his retirement and activity. He sells probabilities, not assurances. It is urged that by the solicitation of the customers of the old firm he is endeavoring to impair the value of that which he has sold; but every act of his in the direction of the establishment of the

new business tends to divert the customers of the old firm. The right to enter into the same line of business in the same locality,—next door, if you please,—to advertise his former connection with the old business, and to solicit generally the patronage of the public, is conceded by the clear weight of authority. The exercise of these rights necessarily involves the diversion of custom to the new firm. Does not the right to engage again in the same line of business include all of the incidents of that right? Upon what principle is the line arbitrarily drawn at the *personal* solicitation of the customers of the old firm? The right to engage in business in his own name attaches to the retiring partner, and, unless expressly so agreed, there is no restraint upon that right.

In the present case, Jacob S. Farrand had been at the head of the old house for half a century. His name could not be subsequently used in the same line of business without attracting the attention of the entire trade, nor without affecting the probabilities of a continuance of the patronage of the old house. He gave no hint that he did not intend to engage again in business. All of the circumstances pointed in the direction of a new business. The retirement was not of Jacob S. Farrand alone, but of his son-in-law and Mr. Clark also. The proposition made to complainants was not only to sell, but to buy.

In *Ginesi v. Cooper*, 14 Ch. Div. 596, the court went so far as to insist that a retiring partner had no right to deal with the customers of the old firm; but that rule would operate as a restriction upon the public, and the case is without support in that respect.

In *Labouchere v. Dawson*, L. R. 13 Eq. 322, the court say that a retiring partner who sells the good-will of a business is entitled to engage in a similar business, may publish any advertisement he pleases in the papers, stat-

ing that he is carrying on such a business; he may publish circulars to all the world, and say that he is carrying on such a business; but he is not entitled, by private letter, or by visit by himself or agent, to solicit the customers of the old firm.

But in *Pearson v. Pearson*, 27 Ch. Div. 145, *Labouchere v. Dawson* is expressly overruled. The court say:

" The case of the plaintiff is founded on contract, and the question is, what are his rights under the contract? There is no express covenant not to solicit the customers of the old business, but it is said that such a covenant is to be implied. I have a great objection to straining words so as to make them imply a contract as to a point upon which the parties have said nothing, particularly when it is a point which was in their contemplation. It is said that there was a sale of the good-will. I think that there was, taking good-will as defined by Lord Eldon in *Cruttwell v. Lye*, 17 Ves. 335. The purchaser has a right to the place and a right to get in the old bills; so the purchaser gets the good-will, as defined by Lord Eldon. But the term 'good-will' is not used; and when a contract is sought to be implied we must not substitute one word for another. * * * But suppose the word did occur, what is the effect of a sale of 'good-will.' It does not, *per se*, prevent the vendor from carrying on the same class of business."

*Vernon v. Hallam*, 34 Ch. Div. 752, held that a covenant by a vendor of a business, including the good-will thereof, that he would not for a term of years carry on the business of a manufacturer, either by himself or jointly with any other person, under the name or style of J. H. or H. Bros. (the name of the business which he had sold), is not a covenant that the vendor would not carry on business as a manufacturer, but against using a particular name or style in trade, and the injunction was granted to restrain a breach of that covenant.

" Where a vendor sold his business, and commenced a similar business in the same locality, and solicited customers of the old house to deal with him, the court,

following the decision in *Pearson v. Pearson,* and being of opinion that the case of *Labouchere v. Dawson* had been overruled by the decision in that case, refused to grant an injunction to restrain such solicitation."

*Leggott v. Barrett,* 15 Ch. Div. 306, *Ginesi v. Cooper,* 14 Id. 596, and a number of other cases cited, follow *Labouchere v. Dawson.*

The correct rule is, we think, laid down in *Cottrell v. Manufacturing Co.,* 54 Conn. 138 (6 Atl. Rep. 791). The court say:

"Cottrell did not require Babcock to agree, and the latter did not agree, to abstain from the manufacture of printing-presses. By purchasing the good-will merely, Cottrell secured the right to conduct the old business at the old stand, with the probability in his favor that old customers would continue to go there. If he desired more, he should have secured it by positive agreement. The matter of good-will was in his mind. Presumptively he obtained all that he desired. At any rate, the express contract is the measure of his right; and since that conveys a good-will in terms, but says no more, the court will not upon inference deny to the vendor the possibility of successful competition by all lawful means with the vendee in the same business. No restraint upon trade may rest upon inference. Therefore, in the absence of any express stipulation to the contrary, Babcock might lawfully establish a similar business at the next door, and by advertisement, circular, card, and personal solicitation invite all the world, including the old customers of Cottrell & Babcock, to come there and purchase of him; being very careful always when addressing individuals or the public, either through the eye or the ear, not to lead any one to believe that the presses which he offered for sale *were manufactured by the plaintiffs,* or that he was the successor to the business of Cottrell & Babcock, or that Cottrell was not carrying on the business formerly conducted by that firm. That he may do this by advertisements and general circulars courts are substantially agreed, we think. But some have drawn the line here and barred personal solicitation. They permit the vendor of a good-will to establish a like business at the next door, and, by the potential instrumentalities of the news-

paper and general circulars, ask the old customers to buy at the new place, and withhold from him only the instrumentality of highest power, namely, personal solicitation. To deny him the use of the newspaper and general circulars is to make successful business impossible, and therefore is to impose an absolute restraint upon the right to trade. This the courts could not do, except upon express agreement. But possibly the old customers might not see these; and in some cases the courts have undertaken to preserve this possibility for the advantage of the vendor, and found a legal principle upon it. Other courts have been of the opinion that no legal principle can be made to rest upon this distinction; that to deny the vendor personal access to old customers even would put him at such disadvantage in competition as to endanger his success; that they ought not upon inference to bar him from trade, either totally or partially; and that all restraint of that nature must come from his positive agreement. And such, we think, is the present tendency of the law."

Good-will may be said to be those intangible advantages or incidents which are impersonal, so far as the grantor is concerned, and attach to the thing conveyed. Where it consists of the advantages of location, it follows an assignment of the lease of that location. Again, it may not depend at all upon location, as in the case of a newspaper, and it would follow an assignment of all interest in the plant, property, effects, and business. A partnership name may become impersonal after the death of the partners, and it is then treated like a fictitious or corporate name. A surname may become impersonal when it is attached to an article of manufacture, and becomes the name by which such article is known in the market, and the right to use the name may in consequence follow a grant of the right to manufacture that article, or a sale of the business of manufacturing such article; and where the right to manufacture is exclusive, the right to the use of the name as applied to that article becomes likewise exclusive.

It appears, however, that in the first bill of sale which was prepared the words, "including the good-will attendant upon the business," were inserted, but were objected to, stricken out, and a new bill of sale prepared, omitting any reference to good-will. But it is said that this clause was objected to because, in the opinion of the objector, it might preclude him from engaging in the same business, whereas, under the law, he would have such a right had the clause remained. The only use, however, which complainants now propose to make of the clause, treated as a part of the instrument, is to restrict that right to engage in business by taking away one of its incidents. Adopting the language used in *Churton v. Douglas,* Johns. Eng. Ch. 174, with reference to the right of plaintiff to continue the use of the old firm name, "I think the defendant is fully entitled to the benefit of the observation that it was proposed to him to insert such a provision, and that he refused it. I think, therefore, that this case goes a step higher than the authorities, and the defendant is entitled to put his case in the highest possible form with regard to his right" to engage in the same line of business.

II. The next question relates to the use by defendants of the firm name of Farrand, Williams & Clark. It is clear that complainants have no right to continue their business under the old firm name. The rule that upon a dissolution of a firm neither partner has the right to use the firm name, as well as the other rule that a retiring partner has no right to use the old firm name, are both subject to the exception that a person has the right to use his own name unless he has expressly covenanted otherwise. In case A. B. should sell out his business to C. D., in the absence of a grant to C. D. of the right to use the name of A. B., or an agreement to the contrary, is there any doubt but that A. B. would have the right

to engage in the same line of business in his own name? In that case, such a probability would naturally suggest itself to C. D., and, if he desired to get the advantage of A. B.'s abstinence from business, he would insist upon an agreement to that effect.

In the present case, Mr. Farrand's name had been at the head of the firm name for nearly half a century, and the name of another of the retiring members corresponded with the only other surname used in the old firm name. It must have been evident to complainants that in any event the name of the new firm would be similar to that of the old firm. If complainants desired any protection against such a use of the names of the retiring members, they should have inserted a provision to that effect in the bill of sale. The right to continue the use of a firm name, as well as a restriction upon the use by a retiring partner of his own name, are proper subjects of bargain, sale, and agreement. Here neither have been purchased. Complainants have purchased the business of the old firm. They have the right to advertise themselves as succeeding to and continuing that business. The exercise of such a right does not conflict with any right reserved by defendants. Complainants, by such a holding out, commit no fraud, misrepresentation, or deception. They publish the truth only. Defendants have the right to use their own names, or any collocation of their own names. They have not adopted the old firm name, although it would have been appropriate. They have adopted no fictitious name. There is no deception in the use of the name adopted by them. The business of the old firm is a separate and distinct business. Defendants have no right to advertise their business as a continuation of the old firm business. They are subject to the rule already laid down, that no man has the right to sell or advertise his own goods or business as that of

another, and so mislead the public and injure such other person.

In *Lathrop v. Lathrop*, 47 How. Pr. 532, after dissolution J. Lathrop formed a copartnership with one Tisdale, and adopted the name of J. Lathrop & Co., which was the style of the old firm. Held that, in the absence of any covenant with his late partner, he might legally do so.

In *Reeves v. Denicke*, 12 Abb. Pr. (N. S.) 92, the court say:

"In this case, the firm name was not sold or transferred to the defendants as constituting a part of the partnership property and effects; nor did the sale, in terms or by necessary implication, include the good-will of the business of the previous firm, and it is therefore unnecessary to determine whether the partnership name was a part of such good-will. There was no restraint upon the retiring partner holding him from engaging in a similar business, and he violated no obligation to the defendants by forming a new firm under his own name, and transacting a business in all respects like that which he had released to them. It is quite clear that the defendants acquired no right to continue the use of the partnership name of the old firm. If the good reputation of that firm was intended to pass into and become a part of the defendants' new firm, it should have been provided for in the conveyance. That it was not intended it should pass is evident from the omission to include it." *Seed Co. v. Dorr*, 70 Iowa, 481 (30 N. W. Rep. 866); *Bassett v. Percival*, 5 Allen, 345; *Machine Co. v. McGowan*, 22 Ohio St. 370.

In *Turton v. Turton*, 42 Ch. Div. 128, although there were no contract relations between the parties, the court say:

"No man can have the right to represent his goods as the goods of another person. Therefore, if a man uses his own name, that is no *prima facie* case, but if, besides using his own name, he does other things which show that he is intending to represent, and is in point of fact

making his goods represent, the goods of another person, then he is to be prohibited; but not otherwise."

In *Hookham v. Pottage,* L. R. 8 Ch. App. 91, plaintiff and defendant had been copartners as Hookham & Pottage. Plaintiff succeeded to the business, and defendant afterwards set up a shop only a few doors away, and printed over the door the words, "Pottage, from Hookham & Pottage." The court held that—

"Defendant had a right to state that he was formerly manager, and afterwards a partner, in the firm of Hookham & Pottage, and that he had a right to avail himself, by the statement of that fact, of the reputation which he had so acquired; but that he had no right to make that statement, or to avail himself of that reputation, in such a way as was calculated to represent to the world that the business which he was carrying on was the business of Hookham & Pottage, or that Hookham had any interest in it."

In *Meneely v. Meneely,* 62 N. Y. 431, the court say:

"If the defendants were using the name of Meneely with the intention of holding themselves out as the successors of Andrew Meneely, and as the proprietors and managers of the old established foundry which was being conducted by the plaintiffs, and thus enticing away the plaintiffs' customers; and if, with that intention, they used the name in such a way as to make it appear to be that of the plaintiffs' firm, or resorted to any artifice to induce the belief that the establishment of the defendants was the same as that of the plaintiffs; and perhaps if, without any fraudulent intent, they had done acts calculated to mislead the public as to the identity of the establishments, and produce injury to the plaintiffs beyond that which resulted from the similarity of name, * * * then the court would enjoin them, not from the use of the name, but from using it in such a way as would deceive the public. * * * Every man has the absolute right to use his own name in his own business, even though he may thereby interfere with or injure the business of another person bearing the same name, provided he does not resort to any artifice or contrivance for the purpose of producing the impression that

the establishments are identical, or do anything calcu-
lated to mislead."

In *Fullwood v. Fullwood,* 9 Ch. Div. 176, R. J. Full-
wood carried on business as manufacturer of annatto at
24 Somerset place, Hoxton, from 1785 to 1832. Plaintiff
and three brothers, one of whom was the defendant, suc-
ceeded to the business, but ultimately the right to carry
on the business vested in the plaintiff. Defendant,
Matthew Fullwood, and another brother formed a
copartnership in the name of E. Fullwood & Co., and
issued and distributed in various ways cards containing
the following: "Established over 85 years. E. Fullwood
& Co. (late of Somerset place, Hoxton), Original Manu-
facturers of Liquid and Cake Annatto." They also
placed around the bottles containing the annatto a
wrapper resembling that which plaintiff used. The court
say:

"Defendants are entitled to carry on their business
under the firm name which they have adopted, if they
are so minded,   *   *   *   provided that they do not
represent themselves to be carrying on the business which
has descended to plaintiff."

In *Bininger v. Clark,* 60 Barb. 113, the defendant
wrongfully advertised himself as successor to the old
firm, and made such a use of his own name as to indi-
cate a fraudulent intent. *Hegeman v. Hegeman,* 8 Daly,
1; *Levy v. Walker,* 10 Ch. Div. 436.

In *Churton v. Douglas,* Johns. Eng. Ch. 174, plaintiffs
and defendant had carried on the business of stuff mer-
chants at Bradford, in a building owned by defendant,
and known as "Hall Ings," under the name and style of
John Douglas & Co. Defendant sold out to plaintiffs all
his share, right, and title in the business, including the
good-will, and executed to plaintiffs a seven-years lease
of the premises occupied by the firm. Within a short

period defendant set up in the same line of business, next door to plaintiffs, in a part of the same building known as "Hall Ings," adopting the old firm name of John Douglas & Co. The court held. that defendant, by the use of the old firm name, and the surroundings, would be obtaining the custom of the old firm, by inducing the belief that his was a continuation of the old establishment. The court say:

"The authorities, I think, are conclusive upon this point that the mere expression of parting with or selling the good-will does not imply a contract on the part of the person parting with that good-will not to set up again in a similar business; but I use the expression 'similar' to avoid including the case of the vendor seeking to carry on the identical business. He does not contract that he will not carry on an exactly similar business, with all the advantage which he might acquire from his industry and labor, and from the regard people may have of him, and that *in a place next door, if you like*, to the very place where the former business was carried on. It is settled that it is the fault of those who wish any protection against such a class that they do not take care to insert the provision to that effect in the deed."

The same principle obtains with reference to trademarks. One may have a right in his own name as a trade-mark, but he cannot have such a right as against another person of the same name, unless the defendant use a form of stamp or label so like that used by the plaintiff as to represent that the defendant's goods are of the plaintiff's manufacture. *Sykes v. Sykes,* 3 Barn. & C. 541; *Holloway v. Holloway,* 13 Beav. 209; *Rogers v. Taintor,* 97 Mass. 291; *Gilman v. Hunnewell,* 122 Mass. 139; *Manufacturing Co. v. Goodyear Rubber Co.,* 128 U. S. 598 (9 Sup. Ct. Rep. 166). The tests applied by all the authorities in this class of cases are: Is a corporate or trade or fictitious name simulated? Is the name assumed or adopted false in fact? Is it used in connection with locality or other representations so as to convey the

impression that the business is a continuation of the old business?

Defendants are not responsible for the blunders made by clerks, postal clerks, mail carriers, telephone employés, or newspaper reporters.

In *Meneely v. Meneely*, the court say:

"Where the only confusion created is that which results from the similarity of names, the courts will not interfere."

In *Turton v. Turton* it is said that—

"Defendants are not responsible for the blunders made by the business community in not distinguishing between John Turton & Sons and Thomas Turton & Sons."

See, also, *Richardson & Boynton Co. v. Richardson & Morgan Co.*, 8 N. Y. Supp. 52; *Manufacturing Co. v. Goodyear Rubber Co.*, 128 U. S. 598.

Any collocation of the names of Farrand and Williams would create some confusion. Defendant Clark had been connected with the old business for 30 years, and Williams, the son-in-law of Mr. Farrand, for 21 years.

Defendants are using their own names only. They went into business on Woodward avenue, several blocks from the old stand. In every letter-head, bill-head, card, or advertisement in which their firm name appears they give the individual names of the members of the firm, the new place of business, and in no case have they represented that they are successors to the old firm. The bill-heads used by the old firm had a cut of the old stand on the left-hand upper corner, about three inches square. Those of the new firm contain no cut, and less than half the amount of matter. It would be exceedingly difficult to prepare two bill-heads more unlike. The letter-heads of the old firm contained two cuts,— one of the old stand, at the left hand, one of the Peninsular White Lead & Color Works, on the right. The

dissimilarity is marked. The envelopes used by the old firm contain eight printed lines on the upper left-hand corner, occupying an inch and three-quarters of space. Those used by the new firm contain five lines, occupying about three-quarters of an inch in space. There has been no attempt at imitation in words or type. On March 15, 1890, they announced, through circulars distributed generally, that they had engaged in business at 32 and 34 Woodward avenue; that they expected to have their new store ready for occupancy in a few days; and that the work of getting a new stock of goods would be pushed as fast as possible. On April 7 they issued another circular, announcing that they were now prepared to fill orders, and hoping that the friendly acquaintance of many years would be continued. An advertisement is produced, wherein defendants say:

"Though it may seem paradoxical, it is nevertheless true, that the wholesale drug-house of Farrand, Williams & Clark is both the oldest and newest representative of this important commercial industry in Detroit."

But in the same advertisement they announce the dissolution of the old firm, their retirement from said firm, and the formation and business location of the new firm. It is difficult to imagine how such an advertisement would mislead the public. It contains no false colors.

Both parties advertised extensively in the city and State papers and in the trade journals; complainants giving the names of their individual members, and their new firm name, and advertising themselves as the successors to Farrand, Williams & Co.; and defendants giving the names of their individual members, and the name and business location of the new firm. Complainants sent out circulars to the trade generally, informing it of the dissolution of the old firm, the fact that they

were the successors, and giving their firm name; and defendants sent out circulars announcing their withdrawal and the formation of a new firm. There is no doubt but that the dissolution of this firm, the fact that complainants had bought out the interest of defendants, the name adopted by complainants, the formation of the new firm, the names of its members, and the defendants' firm name, have been most extensively advertised by both parties, not only in the city, but throughout the State and Union.

Nearly 50 letters have been received by the old firm, since the dissolution, addressed to Farrand & Williams; Farrand & Williams Paint Co.; Farrand & Williams Drug Co.; Farrand, Sheley & Brooks; Farrand, Williams & Sheley; Farrand, Williams, Sheley & Co.; Farrand, Williams & Brooks; Farrand & Co.; Williams, Farrand & Co.; Williams & Farrand; and Williams & Co. It cannot be said that any act of defendants is responsible for these blunders. Confusion is inseparable from the dissolution of an old firm and the composition of two firms from its membership, especially when the name of but one of those who remain has appeared in the firm name, and the new firm is composed of one whose name for nearly half a century has stood at the head of the firm name, and the surname of another retiring member is the same as the only other name used in the old firm name.

It appears that at the outset defendant Clark by mistake opened two or three letters addressed "Farrand, Williams & Co.," but in every other instance defendants refused to receive mail directed to Farrand, Williams & Co., unless directed to defendants' street and number; that in a single instance Clark inadvertently signed a letter "Farrand, Williams & Co.;" that two checks were sent to defendants in payment for goods bought from

them, which were payable to the order of Farrand, Williams & Co., and Mr. Farrand indorsed them Farrand, Williams & Co., and guaranteed the indorsements; that in four instances merchandise or articles not marked but intended for defendants were delivered to complainants, and afterwards taken away; that in two instances complainants were notified by freight agents that freight awaited delivery; that in both the goods were manifested to Farrand, Williams & Co., but marked, and were afterwards delivered, to Farrand, Williams & Clark, for whom they were intended; that complainants were notified that a sample box of glassware had been shipped to them, but they had not received it; that defendants received a sample box of glassware from the same house, which was billed to Farrand, Williams & Clark, and the latter were notified of the shipment by the assignors; that similar boxes of samples had been sent to other drughouses at Detroit; that in one or two instances merchandise had been delivered to defendants which was intended for complainants; that in a single instance a customer at Port Huron, who knew of the dissolution, intending to call up the old house by telephone, asked for Farrand & Williams, was given Farrand, Williams & Clark, and told that it was Farrand, Williams & Clark, asked the price of oil, and ordered one barrel; that 112 letters, telegrams, receipts, or bills were received by complainants directed to Farrand, Williams & Co., which were intended for defendants; that of these 35 were directed on the inside to Farrand, Williams & Clark; that all of the letters so received were from business houses from which defendants were buying goods, and none were from customers of either house. These proofs do not tend to show any appropriation by defendants of the old firm name, or any attempt to secure the correspondence addressed to the old

88 MICH.—32.

firm, or that the customers have been deceived or misled, or that defendants have practiced any fraud, concealment, or deception.

Complaint is made in the bill that defendants have enticed away certain of complainants' salesmen, but this charge is not made out by the proofs.

It is also charged that defendants have simulated certain trade-marks and labels used by the old firm, but no instance of piracy has been established. Complainants have, under the authorities cited, an undoubted right to protection in the proprietary rights acquired by the old firm, and in the use of such trade-marks as were in use by the old firm, and defendants have no right so to imitate the labels in use by the old firm as to convey the belief that the goods labeled are from the old house. The use, however, of the words, "Sold by Farrand, Williams & Co.," or "Prepared by Farrand, Williams & Co.," upon a label, will not be protected as a trade-mark or trade-name, and the right to use that name in that connection did not pass under the bill of sale.

The decree of the court below must be affirmed as of February 27, 1891, and the bill dismissed, with costs to defendants.

MORSE and GRANT, JJ., concurred with McGRATH, J. LONG, J., did not sit.

CHAMPLIN, C. J. (*dissenting*). I cannot concur with the conclusion reached by a majority of the Court in this cause.

In order to arrive at a correct understanding of the issues involved, I have deemed it necessary to set out with considerable particularity the pleadings in the cause, and to refer to the testimony in a general way by which the allegations of the complainants are substantiated;

and, at the risk of repetition of what is contained in the opinion handed down by the majority of the Court, I will proceed to state my views upon the merits of this controversy.

The complainants in this suit are copartners in the wholesale drug trade, under the firm name of Williams, Sheley & Brooks. Their place of business is at Nos. 11 to 17 East Larned street, in Detroit. The defendants are also copartners in the wholesale drug business under the firm name of Farrand, Williams & Clark. Their place of business is at Nos. 32 and 34 Woodward avenue, in Detroit. The bill is filed to enjoin the defendants from using any combination of the names Farrand and Williams as a part of their firm name, and from receiving and appropriating any letters, packages, or other thing addressed upon the outside to Farrand, Williams & Co., or to Farrand & Williams, or to Farrand Williams, and to require them to turn over to complainants any letters, packages, or other thing so addressed which may come to their hands; also to enjoin them from in any way interfering with the business of the complainants as successors of the firm of Farrand, Williams & Co., and from interfering in any way with their receiving and enjoying the business which belonged to the firm of Farrand, Williams & Co., and from interfering with the continuance of said business by complainants; and that they be perpetually enjoined from using or simulating any trademarks, trade-names, brands, labels, or monogram used by the firm of Farrand, Williams & Co., and for general relief.

The bill of complaint alleges that the complainants are doing business under the firm name of Williams, Sheley & Brooks, as successors to Farrand, Williams & Co. The answer of the defendants admits that the complainants are copartners doing business under the firm name of

Williams, Sheley & Brooks, and that they advert'se them-selves as successors of Farrand, Williams & Co., but den'es that they are the legal successors of Farrand, Williams & Co., and that they have the legal right or claim to be such successors.

The bill further states that the defendants are partners doing business under the firm name of Farrand, Williams & Clark, and that they are using said firm name against the rights and equities of the complainants. The defendants, in their answer, admit that they are doing business under the firm name of Farrand, Williams & Clark, but deny that they are using such firm name against the rights and equities of the complainants.

The bill charges that from 1860 to 1870 Alanson Sheley, William C. Williams, and Jacob S. Farrand were partners in the wholesale drug business under the firm name of Farrand, Sheley & Co., in the city of Detroit; that in 1870 the style of the firm was changed to Farrand, Williams & Co.; that defendant Clark was admitted into the firm in 1870; that Richard P. Williams purchased an interest in the firm owned by James E. Davis, and was admitted as a partner, and continued as such from 1880; that in 1884 Jacob S. Farrand, Jr., and Alanson Sheley Brooks were admitted into the firm; and that in January, 1890, the interests of the several partners in the firm were as follows, the whole capital stock being $200,000: Jacob S. Farrand owned three-twentieths; Alanson Sheley, three-twentieths; William C. Williams, five-twentieths; Harvey C. Clark, two-twentieths; Richard P. Williams, three-twentieths; Jacob S. Farrand, Jr., two-twentieths; and Alanson Sheley Brooks, two-twentieths; that, notwithstanding the addition and change of partners in the business, the firm name continued the same from 1870 until the dissolution by sale hereinafter stated, in 1890, the firm name being all that time Far-

rand, Williams & Co.; that this firm had done business at the corner of Larned and Bates streets, in Detroit, from the year 1872 down to the time of the dissolution, in 1890; that the building was erected and owned by Jacob S. Farrand and Alanson Sheley, and the said firm also occupied a store-house on Bates street, adjoining, which store-house, and the land on which it was erected, was owned as follows: Alanson Sheley, one-fourth; Jacob S. Farrand, one-fourth; William C. Williams, one-fourth; Harvey C. Clark, three-twentieths; and Richard P. Williams, two-twentieths; that from the year 1880 the fiscal year of the firm ended on the 1st of January each year, inventory being taken soon after that date annually, and the profits being ascertained according to the respective interests; that there was no new agreement that the firm should continue for another year, but the firm and business went on from year to year by common consent.

The bill further alleges that on the 25th day of January, 1890, the defendant Jacob S. Farrand delivered to Alanson Sheley a certain instrument in writing, of which the following is a copy:

"DETROIT, January 25, 1890.

"J. S. Farrand, R. P. Williams, J. S. Farrand, Jr., H. C. Clark, will pay Messrs. Sheley & Brooks, for their interest in the firm of Farrand, Williams & Co., the amount of their interest being fifty thousand dollars ($50,000), the sum of sixty thousand dollars ($60,000), or they will take for their interest, the amount being one hundred thousand dollars ($100,000), the sum of one hundred and twenty thousand dollars ($120,000), the same to be paid in cash, or in notes acceptable to the parties who sell, one week from to-day, Saturday, the first day of February next; the store to be leased to the party purchasing for a term of five years at a rent of eight thousand dollars ($8,000) a year, and the warehouse to be rented to the party purchasing at a net rental of six per cent. a year on the cost of their interest therein. In case Messrs. Sheley and Brooks sell, the accounts of Mr.

and Mrs. Brooks and George A. Sheley are to be paid at the time of the transfer of their interest."

On the back of this instrument was the following indorsement:

"DETROIT, January 25, 1890.

"We hereby agree to carry out the memorandum agreement on the other side of this paper as therein stated.

"J. S. FARRAND.
"R. P. WILLIAMS.
"J. S. FARRAND, JR.
"H. C. CLARK."

Below which was indorsed the following:

"I hereby agree to carry out the memorandum agreement on the other side of this paper as therein stated.
"A. SHELEY."

That afterwards said Alanson Sheley accepted the proposition made by said defendants which was contained in said instrument, and purchased from said defendants all of their right, title, and interest in the said firm of Farrand, Williams & Co. upon the terms in said instrument mentioned; and on the 1st day of February, 1890, the defendants duly sold all their right, title, and interest in the firm of Farrand, Williams & Co. to said Alanson Sheley for the sum of $120,000, on that day paid to them, and in evidence of said sale the said defendants on the 1st day of February executed under their hands and seals and delivered to the said Sheley a certain instrument in writing, of which the following is a copy, namely:

"*Know all men by these presents,* that we, Jacob S. Farrand, Harvey C. Clark, Richard P. Williams, and Jacob S. Farrand, Jr., of the city of Detroit, in the county of Wayne, and State of Michigan, of the first part, for and in consideration of the sum of one hundred and twenty thousand dollars, lawful money of the United States, to them paid by Alanson Sheley, of the city, county, and State aforesaid, of the second part, the

receipt whereof is hereby acknowledged, have bargained and sold, and by these presents do grant and convey, unto the said party of the second part, his executors, administrators, or assigns, all our right, title, and interest in the firm of Farrand, Williams & Company. This does not include any real estate they may own.

"To have and to hold the same unto the said party of the second part, his executors, administrators, and assigns, forever. And the said parties of the first part, for themselves, their heirs, executors, and administrators, do covenant and agree to and with the said party of the second part, his executors, administrators, and assigns, to warrant and defend the sale of said property, goods, and chattels hereby made unto the said party of the second part, his executors, administrators, and assigns, against all and every person or persons whatsoever.

"In witness whereof we have hereunto set our hands and seals, this first day of February, one thousand eight hundred and ninety (1890).

"J. S. FARRAND.          [L. S.]
"HARVEY C. CLARK.        [L. S.]
"R. P. WILLIAMS.         [L. S.]
"J. S. FARRAND, Junior.  [L. S.]

"Signed, sealed, and delivered in presence of
"F. J. STEVENS.
"FRANK A. LUCE."

This allegation of the bill is admitted by the answer of the defendants.

The bill further alleges that it was the intention of the defendants, in making said proposition evidenced by the said writing dated January 25, 1890, either to sell all their interest in said firm of Farrand, Williams & Co., or to buy all the interest of the complainants said Alanson Sheley and said Alanson Sheley Brooks in the said firm of Farrand, Williams & Co.; and that it was further the intention of all the parties to said proposition, and of all the parties to said purchase and sale, that whichever party should purchase the interests of the others in the said firm should continue the business then being conducted by the said firm at its then place

of business or stand; and that it was well known to the said defendants, and was intended by them when the said proposition was so made, that the complainant the said William C. Williams should remain with whichever party to the said proposition should purchase the interests of the others in the said firm of Farrand, Williams & Co., and should join the purchasers in the continuance of the business of the said firm at said stand; and that it was also known and intended by all the parties to the said proposition that, in case the said Alanson Sheley should purchase the interests of the said defendants in the said firm, and so continue the business of the said firm at its said site, the complainant the said Alanson Sheley Brooks should be associated with said Alanson Sheley and the said William C. Williams in the said business, and that the interests in the said firm, so purchased, should be distributed among them as they might agree. Replying to these allegations of the bill, the defendants claim that their negotiations were carried on with Alanson Sheley personally, and that they had no negotiations or agreement in regard to the continuance of the business with William C. Williams; that he was not a party to the negotiations or sale; that there was no arrangement or understanding or intention on the part of the defendants in regard to the future business of William C. Williams, or as to whether he should remain with the complainants; that Alanson Sheley, personally and individually, was the party to whom they agreed to sell, and who agreed to become the purchaser, and who paid the consideration, and that nothing was said by the defendants or any of the complainants respecting the manner in which the complainants should carry on said business after the purchase by the said Sheley, or as to whether William C. Williams should be a partner with Sheley or with Sheley and Brooks.

The bill further alleges that upon the execution of the bill of sale above set forth, dated February 1, complainants Will ams and Brooks received transfers of and paid for shares of the rights, property, and interests so purchased, and complainants entered into a copartnership on that day under the name of Williams, Sheley & Brooks, in which Sheley and Brooks were each to have a quarter interest and Williams a half interest in the firm; which firm has continued the business of said firm of Farrand, Williams & Co. at the said stand. The defendants deny any knowledge of this statement contained in the bill as to the purchase of shares by Will ams and Brooks and the formation of the partnership by Williams, Sheley, and Brooks. They admit that the complainants entered into a partnership under the name of Williams, Sheley & Brooks, and that they advertised themselves as the successors of Farrand, Williams & Co., but without any legal right or claim to be such successors.

The complainants charge in their bill that they were put in possession by defendants of the premises occupied by Farrand, Williams & Co., and the assets of said firm, and that they have since continued therein as successors of Farrand, Williams & Co., except as they have been interfered with by the defendants; that they have advertised themselves as the successors of Farrand, Williams & Co. The defendants deny that they are such successors. They deny that they put the complainants in possession, and they deny that they have acquiesced in the claim of the complainants that they are the successors of Farrand, Williams & Co. They also deny that they have interfered with the complainants making such a claim.

The complainants further state that on the 1st day of February, 1890, the firm of Farrand, Williams & Co. was indebted to various persons in an amount exceeding

$55,000, and that it was the intention and legal effect of the said purchase and sale that the complainants should assume and pay all of the said indebtedness, and that they gave to the retiring partners a memorandum in writing, to the effect that said retiring partners were released from the liabilities of the said firm; and they further state that they have paid all of the said indebtedness which has matured since said date. The defendants, in their answer, admit the indebtedness of Farrand, Williams & Co., and state that the same was considered in fixing the price at which defendants were to sell to Sheley. They deny that it was the intention or legal effect of such sale that the complainants should pay said indebtedness, and they deny that the complainants gave to the defendants said written memorandum.

The bill further states that on February 1 the annual inventory had been taken, and when they bought all the right, title, and interest in the said firm of Farrand, Williams & Co. of the defendants, the retiring partners, the profits for the fiscal year had been ascertained and paid to the members of the firm in money or notes, in the manner customary with the firm, and the capital stock of the firm stood at the sum of $200,000; that the shares therein of the defendants aggregated one-half thereof, or the sum of $100,000; that in the proposition of sale made by the defendants, and in the price of $120,000 so paid to them, there was included the sum of $20,000 in addition to the par value of their aggregate shares of the capital stock as a bonus or consideration for their share of the good-will of the said firm, and for their share of those certain valuable rights appurtenant to the name and business of said firm, and which all parties to the said purchase and sale intended should be sold with the other assets of said firm, and should be

acquired, possessed, and enjoyed by the purchasers, among which the complainants claim were the following valuable rights and appurtenances:

*First.* That the said firm of Farrand, Williams & Co., during the twenty years of its existence, had built up an extensive trade, and had secured a name and reputation with its customers and with manufacturers and dealers, from whom said firm obtained its stock in trade, which was of great value and advantage to said firm, and would be of great value to its lawful successors.

*Second.* That the firm was broadly known to the drug and other trades throughout the United States by advertisements in pharmaceutical, medical, and trade journals; that its name appeared in trade circulars, directories, and commercial reports printed in the trade centers of the world, as an instance of which they cite "The Annual of Chemical Products and Drugs," published in Paris, in the French language, having a large circulation, and thus reaching dealers and producers everywhere; that said firm purchased goods extensively in England, France, and Germany, and that its name was reputably known to the trade in those countries; that it was a great advantage to said firm that its name was so widely circulated; that valuable discoveries were constantly making in the sciences and trades to which its business related; that new remedies and new goods were constantly appearing and being placed on the market, and the attention of said firm called to them through the instrumentality of letters and circulars received through the mails, addressed to said firm, because its name appeared in said trade circulars, directories, and commercial reports; that for a long period of time, and because many of such directories are published and circulated but annually, it is probable that the name of Farrand, Williams & Co. will appear therein, and that advertisements of new preparations, remedies, and manufactures will continue to be sent by mail to said firm of Farrand, Williams & Co., and that the right to receive the same is a valuable right.

*Third.* That the firm of Farrand, Williams & Co. manufactured or had manufactured for it a large number of pharmaceutical and proprietary preparations, with which the name of the firm was directly connected, and which were made and placed upon the market by no other dealer in drugs, and which in the drug trade were

known to be a part of the business of said firm; that certain of said preparations were named as follows: "Conger's Regulator," "Conger's Liver Pills," "Farrand's Extract of Jamaica Ginger," "Farrand's White Rose Tooth Powder," "Davis' Carbolic Oil Liniment;" and that there were other of said preparations; that the exclusive right to sell said remedies was possessed by the said firm, and that said right was valuable, and would be valuable to its lawful successors.

*Fourth.* That the firm was also largely engaged in the manufacture and sale of medical fluid extracts; that it sold many tons thereof yearly, and that they were well and favorably known to the trade as "Farrand, Williams & Company's Fluid Extracts;" that physicians, in prescribing fluid extracts as component parts of prescriptions, commonly designate fluid extracts of a manufacture with which they are familiar, on account of the variations in strength and efficiency in extracts made by different manufacturers; and that Farrand, Williams & Co.'s fluid extracts were widely known by physicians to be of uniform strength, and were largely prescribed for that reason; and that said extracts were commonly ordered and referred to in the trade by the use of the abbreviations "F., W. & Co.;" and that said name and abbreviations became valuable trade-marks, possessed by said firm, and which passed to the legal successors of said firm.

*Fifth.* That the firm dealt in certain ochres, which were known as "Farrand, Williams & Co.'s Ochres," and in other goods which were distinctly known and referred to in the trade in connection with the name of said firm.

*Sixth.* That goods were generally shipped to said firm addressed to "F., W. & Co.;" that said abbreviation was used upon the labels of said firm, and was blown into the bottles used by it.

*Seventh.* That the said firm possessed certain exclusive and valuable agencies; that it was the duly-appointed exclusive agent for Michigan of J. C. Ayer & Co., of Lowell, Mass., for the sale of "Ayer's Sarsaparilla" and "Ayer's Pills," and the other medical preparations of the said Ayer, and was also the exclusive agent for Michigan of the Peninsular White Lead & Color Works, of Detroit, selling the products of said works through traveling agents of said firm at a profit.

*Eighth.* That the firm also had manufactured for it certain other goods in the line of its trade, which were

sold exclusively by said firm under a name or brand adopted by said firm, which became a trade-mark of said firm; and in particular that said firm dealt in certain lyes, which were made expressly for said firm, and for no other dealers, which were well known to the trade by the names "Castle Lye" and "Empire Lye," and that the exclusive right to sell said brands of lyes was valuable.

*Ninth.* That the firm for many years had used a monogram, composed of the letters "F. & W.," and the abbreviation "Co." placed within them; and that said monogram was well-known to the trade as representing the name of said firm.

The complainants further allege in their bill that by the said purchase and sale they have become the lawful successors of the said firm of Farrand, Williams & Co., and entitled to the use of the said firm name, and to advertise themselves as the successors of said firm, and become entitled to all the trade-names, trade-marks, brands, agencies, *formulæ*, monograms, and exclusive rights hereinbefore referred to, and all other rights pertaining to or arising out of the name or business of said firm of Farrand, Williams & Co.

The defendants deny that the complainants bought all the right, title, and interest of the defendants in the firm of Farrand, Williams & Co. They admit that the annual inventory had been taken prior to the sale to said Sheley, the profits for the fiscal year had been divided, and the capital stock was inventoried at $200,000, one-half of which fell to the defendants. They deny that the $120,000 paid by the said Sheley for said interest included any bonus or consideration for defendants' share in the good-will of the firm, or their share in any rights appertaining to the name and business of said firm, or that it was intended that the defendants' interest in such good-will or the right to use the name of Farrand, Williams & Co. was sold or included in the defendants' transfer to said

Sheley. They show that the bill of sale first prepared by and under the direction of Sheley included by name the good-will of the said firm, and that the defendant Clark expressly refused to execute said bill of sale or any bill of sale which included said good-will; that subsequently the words "good-will" were stricken out of said bill of sale, and were afterwards erased, and that subsequently, by mutul consent, a new bill of sale was drawn under the direction of said Sheley, and executed by the defendants; and they aver that it was expressly understood by the defendants and said Sheley that said defendants would not and that they did not by said bill of sale convey or intend to convey to said Sheley defendants' interest in the good-will of the firm of Farrand, Williams & Co., or in the name of said firm, or the right on the part of Sheley or his assigns to do business as the successors of said firm. They admit that Farrand, Williams & Co. had built up an extensive trade and reputation, but whether the same would be of value to its successors would depend upon the character and business reputation of the successors. They admit that new goods are constantly appearing and being placed on the market through the instrumentality of letters and circulars received by said firm, and that said advertisements may be sent to Farrand, Williams & Co. by mail, but deny that the right of receiving said advertisements is of any particular value. They admit that Farrand, Williams & Co. manufactured certain preparations mentioned in the bill, but do not admit that the exclusive right to sell such preparations was possessed by said firm. They deny that the name or abbreviations used by the firm of Farrand, Williams & Co. were valuable trade-marks, or that the same passed to the complainants. They admit that Farrand, Williams & Co. had dealt in ochres known as "Farrand, Williams & Co.'s Ochres," and that goods

were frequently shipped, addressed to "F., W. & Co.," and that said abbreviation was used on labels; but they deny that the abbreviation constituted a trade-mark. They admit that the firm was agent for J. C. Ayer & Co., but claim that such agency was revocable at any time, and they deny that it was transferred to the complainants. They admit that the firm manufactured certain goods; that the same sold by the name or brand adopted by the firm, but they deny that the same became a valid trade-mark. They deny that the names "Castle" and "Empire" constitute valid trade-marks, or that the right to sell lyes under said brands could be made exclusive to said complainants. They admit that the said firm used a monogram, but deny that the same constituted a valid trade-mark.

The complainants further charge in their bill of complaint that said William C. Williams is the person whose name was included in the firm name of Farrand, Williams & Co.; that said combination of names became a valuable trade-mark or trade-name; that his name contributed as much to the value of said combination as did the name of said Farrand; and that he has never sold or otherwise parted with his interest in the said combination of names, but, on the contrary, the complainants have purchased and paid for the interest of said Farrand therein. And they claim that it is inequitable and unlawful for the said Jacob S. Farrand and the other defendants to continue to use the name of said Farrand in combination with that of Williams to create a firm name which so closely resembles the name of the former firm of Farrand, Williams & Co. as to deceive the public, and deprive the complainant William C. Williams of the value to him of the use and combination of his name with that of Farrand.

The defendants, in their answer, admit that William

C. Williams' name was used in the firm name of Farrand, Williams & Co., but they allege that Richard P. Williams was also a member of said firm, and that on the letter-heads and stationery used by the said firm the name of Richard P. Williams appeared as well as the names of the other members of the firm. They deny that William C. Williams' name contributed as much to the value of the firm name of Farrand, Williams & Co. as did the name of Jacob S. Farrand, who had been engaged in business, and had acquired a reputation, before said William C. Williams became interested therein. They allege that William C. Williams knew of the sale made by the defendants to said Sheley, and did not object to the sale or dissolution of the firm of Farrand, Williams & Co., which resulted therefrom. They further allege that the said Jacob S. Farrand, Jacob S. Farrand, Jr., Richard P. Williams, and Harvey C. Clark have the legal and equitable right to use their own names in any legitimate business, as individuals or in connection with each other as a firm. They deny that they have used their names so as to interfere with any legal right said William C. Williams, the complainant, may have to the use of his own name; and they deny that he has a right to use the name of said Farrand in combination with his own name or otherwise.

The complainants further allege in their bill that the distinctive names in the firm name of Farrand, Williams & Co. were the names of Farrand and Williams, and they allege that letters were frequently received by the firm of Farrand, Williams & Co. which were addressed to Farrand & Williams, or to Farrand Williams, or to Williams & Farrand, or to William Farrand, and that letters continue to come so addressed; that on or about the 9th of April, 1890, the complainants received a letter addressed to Farrand & Williams; that on or about the 1st day of

April they received a postal-card addressed to Williams, Farrand & Co.; that on the 4th day of April they received a letter addressed to Farrand & Williams; that about the same time they received another letter addressed to Farrand & Williams; that on or about the 24th of March, 1890, they received a postal-card from Cleveland, addressed to Farrand & Williams; that on or about the 23d of March they received a letter from Norwalk, Ohio, addressed to Farrand & Williams; that on or about the 1st day of April they received a letter from Detroit, addressed to Farrand Williams; that on the 28th of March they received a letter addressed Farrand, Williams & Brooks; that all the letters so received were letters pertaining to business to be transacted by complainants; and that in all such cases the senders of such letters believed they were dealing with the firm of Farrand, Williams & Co. and their lawful successors. They also set out a great number of like instances. .

They further charge that, notwithstanding they purchased all the right, title, and interest of the said defendants in the said firm of Farrand, Williams & Co., and paid them a large bonus or consideration for the right to become successors of said firm, and to have and enjoy a continuance of the business of said firm and the rights before mentioned, and although the said William C. Williams has never parted with his interest in the combination of his name with that of the defendant Farrand, yet the said defendants, inequitably and unlawfully contriving to deprive the complainants of the value of the property and rights so acquired and possessed by them, and to gain the benefit of the combination of the names Farrand and Williams, have commenced a business at Nos. 32 and 34 Woodward avenue, in the city of Detroit, as near in character as possible to the business which

was conducted by the said firm of Farrand, Williams & Co., and which is being continued by the complainants, and have assumed the firm name of Farrand, Williams & Clark, and by the assumption of said firm name, and by various devices and means hereinafter set forth, have attempted to lead the public to believe that said firm of Farrand, Williams & Clark were the successors of said firm of Farrand, Williams & Co., and to withdraw from the complainants and secure for themselves business which otherwise naturally would have fallen to the complainants as successors of said firm of Farrand, Williams & Co.

The defendants, answering, deny that complainants ever purchased the interest of the defendants in the firm of Farrand, Williams & Co., or paid a bonus or consideration for the right to become the successors of said firm, or to continue its business. They deny that William C. Williams has not parted with his interest in the combination of the names of Farrand and Williams. They admit that they have commenced business, as stated, under the name of Farrand, Williams & Clark. They deny that in doing so they have contrived to deprive the complainants of any rights to which they are entitled, and they deny that by the assumption of said firm name defendants have sought to lead the public to believe that they are the successors of Farrand, Williams & Co., and deny that they have sought to secure to themselves business by means or devices which they are not legally entitled to employ, or that they have attempted to interfere with the complainants doing business under the firm name of Williams, Sheley & Brooks.

The complainants charge that Farrand, Williams & Co. used a blue envelope, with the firm name printed at the corner, with the customary request for return; that no other jobber in drugs in Michigan used a blue envelope; that such

envelope, so printed, was well known to the trade, and indicated a letter from Farrand, Williams & Co.; that, intending to deceive the public, defendants have adopted and are using an envelope of the same color and size, and that the printing thereon is arranged as nearly as possible as upon the envelope of said firm of Farrand, Williams & Co. The defendants, in their answer to this charge, admit that Farrand, Williams & Co. used a blue envelope, and that defendants also used blue envelopes and white ones. They deny that the use of such blue envelopes is calculated to deceive the public, or that they were intended to deceive; and deny the other charges with reference to such envelopes.

The complainants further charge in their bill of complaint that the defendants contrived by the arrangement of their firm name to have it resemble as nearly as possible the name of Farrand, Williams & Co.; that upon their letter-heads the defendants' names are in the following order: Jacob S. Farrand, Harvey C. Clark, Richard P. Williams, Jacob S. Farrand, Jr.; that said Clark has been engaged in the drug business a longer time than Richard P. Williams, and ordinarily his name would precede that of Richard P. Williams in the adoption of a firm name; that the defendants have placed purposely the name of said Williams before that of Clark in the firm name, in order that the combination might lead the public to believe that they were the old firm of Farrand, Williams & Co.; and they aver that defendants are actually making use of the name of Farrand, Williams & Co.; that on April 8, 1890, they addressed a letter to W. Parks, of Reese, Mich., signed "Farrand, Williams & Co." Defendants, in their answer, deny that in adopting their firm name defendants intended to adopt a name resembling as nearly as possible the name of Farrand, Williams & Co.; that the arrangement of the names was

for convenience and euphony. They deny that the name
of Richard P. Williams was placed before that of said
Clark for the purpose of leading the public to suppose
that the firm was the old firm of Farrand, Williams &
Co. They deny that they adopted their firm name for
any fraudulent purpose. They admit writing a letter to
Parks, and that it was signed "Farrand, Williams & Co."
through mistake and inadvertence of the defendant Clark.

The complainants charge that the defendants have
enticed certain traveling salesmen formerly employed by
Farrand, Williams & Co. from the employment of the
complainants into the employment of defendants.
The answer denies this allegation, and states that the
salesmen solicited employment from defendants without
any suggestion on their part.

The bill further alleges several specific acts of the
defendants, which complainants claim were intended to
and did deceive the public, and lead them to believe that
Farrand, Williams & Clark were the successors of Far-
rand, Williams & Co., and that the public were misled
thereby.

The testimony was taken in open court, as in suit at
law, and, while it is not my purpose to refer at any great
length to the testimony introduced in the case upon either
side, some of the testimony will be referred to in the
course of my opinion.

The gist of the complaint is that by the purchase of
the defendants' interests in the stock and business of the
firm of Farrand, Williams & Co. the complainants
obtained and are entitled to what is sometimes designated
as the "good-will" of the firm of Farrand, Williams &
Co., and that they had a right to succeed to the trade
and business carried on by that firm, and to hold them-
selves out to the public as the successors of Farrand,
Williams & Co., and to receive all the benefits to be

derived from that position, including the receiving and opening of the mail addressed to Farrand, Williams & Co.

The first question, therefore, to be determined is whether the complainants did purchase of the defendants what is usually denominated as the "good-will" pertaining to the old firm of Farrand, Williams & Co., and the right to denominate themselves as successors to such firm; and to arrive at a correct solution of this question it is necessary to consider the contract and negotiations entered into between the parties; and first I may say that, in view of the circumstances surrounding the transaction, I have no hesitation in reaching the conclusion that Alanson Sheley represented, to all intents and purposes, the firm of Williams, Sheley & Brooks, the complainants in this case. Those facts and circumstances show that Mr. Sheley, at his age and condition of life, did not intend to make this purchase for himself individually, but that the defendants knew, from all the surrounding facts and circumstances, that he was acting for himself and Mr. Brooks, and that Mr. Williams, the complainant, would go with and be concerned in business with whichever party should finally make the purchase. So it is unnecessary to consider the point raised by the defendants that this sale was made to Alanson Sheley individually, and that he could not convey, even if he purchased the good-will of the partnership, that incident of the purchase to the firm of Williams, Sheley & Brooks.

It is claimed on the part of the complainants that by virtue of the bill of sale executed by the defendants to Alanson Sheley the good-will of the firm of Farrand, Williams & Co. was conveyed to Alanson Sheley, and, in effect, to them. The bill of sale referred to, which bears date the 1st day of February, 1890, states that, in consideration of the sum of $120,000, the defendants, by the name of J. S. Farrand, Harvey C. Clark, R. P. Will-

iams, and J. S. Farrand, Jr., thereby granted and conveyed unto the said Sheley, his executors, administrators, or assigns, all of their right, title, and interest in the firm of Farrand, Williams & Co., not, however, including any real estate which they owned. The complainants insist that this bill of sale includes in its terms what is known as the "good-will" of the firm, and in support of their position they point to the facts and circumstances which preceded the execution of the bill of sale, and which tend to throw light upon what property was intended to be conveyed by it. They point to the fact that the inventory which had been recently completed, and which formed the basis of the sale between the parties, inventoried at the sum of $200,000, which covered all the property of a personal nature belonging to the firm. They also point to the fact that Mr. Jacob S. Farrand, in his offer for sale or purchase, included therein as a purchase price 20 per cent. upon the value of the property as inventoried. This, they claim, was intended to cover the good-will of the firm,—that property, intangible in its nature, and which, as they claim, formed an asset of the firm which was not included in the inventory. They claim further that it was intended to cover the benefit and advantage which would accrue to the partners who bought the concern as a going concern in continuing its business at the old stand, which is one of the elements included in the term "good-will."

On the contrary, the defendants insist that it was not intended to convey to the complainants or to Sheley what is known as the "good-will" of the old firm of Farrand, Williams & Co.; and they claim, and one of them so testified, that the 20 per cent. included in the purchase price above the amount of the inventory was merely included for the reason that the outgoing partners would necessarily be out of business for more or less time, and

it was intended including this advance in the purchase
price to afford them something to live upon in the mean
time. But further, and more significant than that, they
claim, and it is not disputed, that the first bill of sale,
prepared under Mr. Sheley's direction, and which was
signed by Mr. Farrand and Mr. R. P. Williams, included
in its very terms the expression, "and the good-will
attendant upon said firm's business;" that this was struck
out of the bill of sale and erased, upon objection made
by Mr. Clark, one of the partners, and that the bill of
sale that was actually executed did not contain that
expression.

This leads us to an examination of the facts, in order
to determine the intent of the parties in striking out
from the bill of sale the words referred to. The testi-
mony shows that when the first bill of sale was prepared
and presented to Mr. Clark for his signature after Mr.
Jacob S. Farrand and R. P. Williams had signed it, upon
reading it over he objected to the words quoted above,
for the reason, as he stated in his testimony when taken
in open court, that he was not very well acquainted with
legal phraseology, and he feared that if those words
remained in the bill of sale it would prevent him from
engaging in business of the kind which he was then
engaged in. This was his sole and only reason for wish-
ing those words to be erased from the bill of sale. Upon
the fact being brought to the attention of Mr. Sheley
that Mr. Clark objected to those words in the bill of sale,
he directed that they be stricken out, for the reason that
he was unacquainted with the legal significance of those
words, and supposed that they had no other meaning
than a good wish or good will on the part of Clark for
the success of the purchaser in carrying on the business;
and, so regarding them, it appears that he called upon
the mother of Mr. Clark and stated to her that he was

surprised that her son, between whom and himself had always existed the most kindly and friendly feeling, should not be willing to wish him good luck; but, as Mr. Clark objected to the words, he directed Mr. Stevens to scratch out that good-will, saying that it did not make any difference to him; that he knew Mr. Clark had good wishes for him; so it was struck out. It therefore appears, respecting this change in the language in the bill of sale, that neither Mr. Sheley nor Mr. Clark understood the legal significance of the term, and both supposed it to amount to something different from what the actual significance is when applied to a business carried on by a person or firm; and it appears to me from the testimony that it was the intention of the parties at the time of the sale and purchase the one to purchase, and the others to convey, the good-will of the firm of Farrand, Williams & Co.; and, in order to understand this position more fully, it were perhaps well that we should define what we understand by the term "good-will of a business."

The good-will of a business is the property of the firm, since it is the result of the joint labors of the partners. It includes within its signification the reputation of the firm for fair dealing and probity. It is more extended in its signification at the present day than it was in the time of Lord Eldon. The manner of conducting business has changed since that day. Wholesale houses now carry on the mass of their business by means of agents or persons soliciting trade, or through the medium of the mails; and customers rarely, if ever, visit the place of business. We think that the definition given by Story in his work on Partnerships, at section 99, is a fair one. He describes "good-will" as being—

"The advantage or benefit which is acquired by an establishment beyond the mere value of the capital, stock,

funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers on account of its local position or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices."

See, also, *Carey v. Gunnison* (Iowa), 17 N. W. Rep. at page 885. As showing the later view entertained of the term "good-will" in the English courts, I quote what was said by the court in the case of *Churton v. Douglas,* Johns. Eng. Ch. 174:

"It was argued that in *Shackle v. Baker*, 14 Ves. 468; *Cruttwell v. Lye*, 17 Id. 335; and *Kennedy v. Lee*, 3 Mer. 452, —Lord Eldon has laid down the principle that an assignment of the good-will of a trade *simpliciter* carries no more with it than the advantage of occupying the premises which were occupied by the former firm, and the chance you thereby have of the customers of the former firm being attracted to those premises; but it would be taking too narrow a view of what is there laid down by Lord Eldon to say that it is confined to that. 'Good -will,' I apprehend, must mean every advantage—every positive advantage, if I may so express it, as contrasted with the negative advantage of the late partner not carrying on the business himself—that has been acquired by the old firm in carrying on its business, whether connected with the premises in which the business was previously carried on, or with the name of the late firm, or with any other matter carrying with it the benefit of the business. * * * It would be absurd to say that where a large wholesale business is conducted the public are mindful whether it is carried on at one end of the Strand or the other, or in Fleet street, or in the Strand, or any place adjoining; and that they regard that, and do not regard the identity of the house of business, namely, the firm."

Such good-will is measured by the value placed upon that which may be so special about a business, or the mode of conducting it, or the place in which it is con-

ducted, as to give it peculiar prominence and profit in the estimation of business men. *Fay v. Fay* (N. J. Ch.), 6 Atl. Rep. 12. So, in applying the signification of the term to the sale of the defendants' interests in the firm of Farrand, Williams & Co., it is proper to consider the facts with reference to the situation of the firm at the time the sale was made. It had been a long time in existence, and had acquired a reputation among business men in the trade throughout the United States; and seems to have been regarded as one of the leading firms in that business in the country. The contract between the parties was that the purchasers should continue the business at the stand then occupied by Farrand, Williams & Co. for a term of five years. It was known to all the partners that persons who had been in the habit of dealing with this firm would, for a considerable time at least, continue to address their communications to Farrand, Williams & Co., as they had been in the habit of doing in the past. That was an interest in the firm which was valuable, and which, by the bill of sale, passed to the purchaser. Moreover, it is difficult to escape the conclusion that the added price above the inventory was to cover the value of just such property as that which I have been describing.

The testimony shows that complainants claimed the right, immediately upon the purchase, of advertising themselves as the successors of the firm of Farrand, Williams & Co.; that they had their name, with that appellation, added immediately upon the bill-heads and the letter-heads and upon the envelopes which they had purchased from the retiring partners under the bill of sale mentioned. It is also in evidence that the defendants, until they filed their answer in this case, did not claim the right to receive and open the correspondence addressed to Farrand,

Williams & Co., but that, when they did so by mistake, they forwarded such correspondence to the complainants in this case.

The testimony shows that the property included in the inventory which the complainants purchased consisted not only of the drugs, medicines, paints, glassware, etc., on hand, but the bills receivable and the "Conger Regulator" trade-mark; and, further, packages, price catalogues, bottles, and bottle-moulds were inventoried, as well as the printed matter, labels, wrappers, and circulars. This printed matter was inventoried at $1,000, and the glassware having the "F., W. & Co." or Farrand, Williams & Co., imprint, at $5,000. And, as further bearing upon the question as to what was sold by defendants and purchased by complainants, it is proper to take into account and consider the negotiations which preceded the actual execution of the bill of sale of date February 1, 1890. It appears in evidence that the talk about the sale of the property commenced some time in the month of January, at which time Mr. Farrand, Sr., proposed to sell out, or in some way bring about a dissolution of the firm. Mr. Sheley refused to consider any offers until after the inventory was completed, and they ascertained the value of the stock on hand and the property belonging to the firm. This was finished in January, just previous to the time when the first proposition, of date January 25, was made in writing by Mr. Farrand, Sr., to Mr. Sheley. That proposition was considered, and was finally accepted on the 27th day of January, at which time it was agreed that the retiring partners should remain and work for the new firm until the first of the next month, —February. Immediately upon the acceptance of the proposition $2,000 was paid down, and the complainants, among themselves, formed the new firm of Williams, Sheley & Brooks; and immediately the stationery, con-

sisting of envelopes, letter-heads, bill-heads, etc., was piled in large baskets, and sent to the printers, and the firm name, "Williams, Sheley & Brooks, Successors to Farrand, Williams & Co.," was printed upon them, and they were returned on the 29th, and were used in the store while the defendants were still there. In addition to this, Mr. Farrand testified, when pressed upon cross-examination, that he had no doubt there would some one go on with the business; and that the purchase was made, as he understood it, "in the sense that the business was to be carried right on by their concern as successors of the old concern." I have already called attention to the fact that the offer of sale included a lease of the store for five years and the warehouse to the purchasing party.

The complainants testify that the purchase was that of a going concern, and that they were to continue the business as the successors of Farrand, Williams & Co.; and, when all the facts and circumstances concerning the transaction of the sale and delivery are considered, there can be no doubt but that the purchase by the complainants included the right to continue the business at the old stand, the right to advertise themselves as the successors of the old firm, and the right to use the monogram "F., W. & Co." and the name "Farrand, Williams & Co." blown in the bottles, and all the trade-marks and *indicia* made use of by the firm of Farrand, Williams & Co. as an advertising medium to the public to indicate the proprietorship of the articles manufactured by them under the names which were then in vogue in the business.

It is strenuously contended by counsel for the defendants that, if the good-will was sold by them, it was sold to Alanson Sheley individually, and therefore the firm of Williams, Sheley & Brooks had no right to the good-will

of the old concern, for the reason, as alleged, that the covenant by which the property was conveyed to Sheley was personal, and the good-will of the old concern was not assignable.  I have already stated that the testimony shows without doubt that, although Mr. Sheley negotiated the purchase in his individual name, yet it was well understood by all the parties that he was making the purchase for the benefit not only of himself, but of Mr. Williams, and also of his grandson, Mr. Brooks.  This is evident from what transpired during the negotiations. In the first place, it appears from the testimony that Mr. Williams, the complainant in this suit, did not desire to sell his interest in the partnership, whoever of the partners sold their interest to their copartners; that he desired to continue in the business, and was willing to remain in the business with the purchaser; and that all parties also were willing that he should do so.  This is evident from the proposition that was first made by Mr. Farrand, which was signed by each of the defendants individually, and stated that they would pay Messrs. Sheley and Brooks for their interest in the firm of Farrand, Williams & Co., or they would take for their interest, a certain amount stated.  In these propositions Mr. William C. Williams' name is not mentioned, thus corroborating the testimony of Mr. Williams and others that he was willing to continue in business with the purchasing party.  It also further shows that these parties who made the proposition well knew that Mr. Sheley was not intending to purchase individually, for their proposition was made to Sheley and Brooks; and that, coupled with the understanding that Mr. William C. Williams would continue with the purchasing party, demonstrates that they knew, and that the parties all intended, that the sale should be made to the three persons who compose the present firm of the complain-

ants, and that Mr. Sheley was merely acting in their interest and behalf. Further than this, after that proposition was accepted by Mr. Sheley as an individual, and the complainants had inaugurated their firm, and agreed upon the firm name of Williams, Sheley & Brooks, and before the bill of sale was executed, the policies of insurance, which had formerly been in charge of Mr. Farrand, were looked over by him, and by him indorsed in behalf of the firm of Farrand, Williams & Co. to the firm of Williams, Sheley & Brooks. The testimony shows that he was some three or four days in making these assignments of the policies, and preparing them for his final signature on the 1st of February. Further than that, it appears that Mr. Farrand, Sr., required that the new firm should give to the retiring partners an undertaking to assume and pay the legal liabilities and obligations existing against the firm of Farrand, Williams & Co., and, although it is true that the defendants denied under oath that such was their requirement, or that any such paper was given, yet upon the witness stand they are forced to admit and to produce the document, which bears date and reads as follows:

"DETROIT, Jany. 31, 1890.

"For value received, we hereby assume all the legal liabilities and obligations against the firm of Farrand, Williams & Co.     WILLIAMS, SHELEY & BROOKS."

This shows that they knew, at the time the bill of sale of date February 1 was executed, that they were selling to the new firm of Williams, Sheley & Brooks, the complainants in this suit. The bill of sale, running to Mr. Sheley, individually, was dated February 1, but here is a paper which shows what the mutual understanding and agreement was, in addition to the fact that the policies of insurance were assigned to Williams, Sheley & Brooks; and it is idle for the defendants now to claim

that their agreement and covenant for the sale of the business of the old firm was made with Mr. Sheley individually, and that, therefore, the complainants in this suit are not entitled to insist that they purchased the property, including the good-will, of the old firm. Immediately after the execution of the bill of sale the complainants advertised themselves as successors of Farrand, Williams & Co. throughout the State, in daily, weekly, and trade journals, and defendants never objected.

The complainants claim that the $20,000 which they paid to the defendants over and above the value of the goods inventoried was intended to cover the rights which they acquired in purchasing the going business of the old firm, and included the good-will of that firm. The defendants do not agree with each other, nor with the complainants, as to what the $20,000 over and above the value of the goods was paid to them for. Mr. Clark testifies that the firm had usually made a profit of about 20 per cent. a year, and that this 20 per cent. was to go to the parties selling, so that they would have something to live on, as by selling out they would necessarily have to remain out of business a certain period. If his version of the matter and the inference to be drawn therefrom are correct, it would seem to show that the parties did not intend to go into business again under a year, if they were receiving from the purchasing party the usual profit of 20 per cent. upon the business. Mr. R. P. Williams, when inquired of repecting what this $20,000 was for, replied, "Mr. Farrand can tell you better than I can," but stated that his view of it was this:

"That there was dissatisfaction, and that was an offer to either give or take; and that the expense of starting a new business would be worth fully $20,000 to start a new business."

He was then asked:

"*Q.* That the right to go on with that business at that location was worth $20,000?

"*A.* Yes; that is, one-half interest.  Mr. Farrand only represented one-half."

Mr. Jacob. S. Farrana testifies that he understood that the bonus of $20,000 was paid and the interest was purchased in the sense that the business was to be carried on by the new concern as the successors of the old firm. Messrs. Sheley, Williams & Brooks all testify that this bonus of $20,000 was for the retiring partners' interest in the going business, in the knowledge that it was to be continued uninterruptedly, with the exclusive right to the use of the name Farrand, Williams & Co.

It appears that during the negotiations which had taken place in December it was suggested by Mr. Farrand that, if they made a sale, they would agree not to go into business again for a term of five years; but this proposition was not accepted, finally culminating in this, which followed in January.  The defendants each and all testify that at the time they made the sale, and for some time after, nothing was said between them as to resuming business in the city of Detroit, but it appears from the testimony that soon after the new firm purchased their interests there was casual talk between the retiring partners, and also between them and three, at least, of the former employés of the firm of Farrand, Williams & Co., who, after the dissolution of the old firm, were continued in the employment of Williams, Sheley & Brooks, in which these employés manifested a willingness and a desire to go into the employment of the new firm, if it should be formed by the defendants. These were important agents of the firm of Williams, Sheley & Brooks, as they were traveling salesmen, at least two of them, and had been in the employ of the old firm for a number of years, and were well acquainted with its customers.  To transfer their influence to a rival

firm could not have resulted otherwise than an injury to the firm of Williams, Sheley & Brooks; and, while the defendants deny any effort to entice these employés away from the firm of Williams, Sheley & Brooks, yet they admit that they told them that if they left the employment of Williams, Sheley & Brooks they would be very glad to take them into their service. The motive for doing so is apparent. The result was that, about the 6th or 8th of March following the sale of their interests in the old firm, they formed a new firm under the name of Farrand, Williams & Clark, and entered into a competitive business at 32 and 34 Woodward avenue, Detroit.

With reference to the firm name adopted by the new associates, it appears from Mr. Farrand's testimony that the reason for using the names in the succession which appears in their new firm of Farrand, Williams & Clark was simply for the sake of euphony. He testifies that he thought it was a good name, a natural one, and he suggested it. He was asked this question:

"Q. You say, Mr. Farrand, the fact that the names of Farrand and Williams had been connected with the old firm had nothing to do with it? Do you say that, Mr. Farrand?

"A. I won't say that it had nothing to do with it. I say that it was familiar, and came naturally to me, and that is the way I answered them."

Mr. Richard P. Williams testifies, with reference to their adopting the name of Farrand, Williams & Clark, as follows:

"It was a family name. I will tell you there was this about it: It had become a family name, and we wished to continue it that way. If Mr. Clark had wanted to retire any time, the firm could be Farrand & Williams.

"Q. How about the family name?

"A. We have a boy named Farrand Williams.

"Q. That boy was named long after that name was established?

"*A.* Yes, sir.

"*Q.* How long had the name Farrand Williams been in existence before you became connected with the firm?

"*A.* Eight years.

"*Q.* That grew out of Jacob S. Farrand and W. C. Williams?

"*A.* Yes, sir."

After adopting this name, the defendants proceeded to advertise their business in an advertising medium called "The Industrial Advantages of Detroit," in which they inserted quite a lengthy article. In it they stated as follows:

"Though it may seem paradoxical, it is nevertheless true, that the wholesale drug-house of Farrand, Williams & Clark is both the oldest and newest representative of this important commercial industry in Detroit. Its proprietors are old and well known to the business. The location of the enterprise and its entire stock are entirely new."

The article then proceeds to give a short biography of Mr. Jacob S. Farrand, the head of the firm, and then states:

"On February 6 of the present year, the firm of Farrand, Will·ams & Co. having been dissolved, Messrs. Jacob S. Farrand, Harvey C. Clark, Richard P. Williams, and Jacob S. Farrand, Jr., withdrew from the house, and formed the new firm of Farrand, Williams & Clark, which, by the time this reaches the eye of the reader, will have been ready to supply their extensive and wide-spread trade with everything in the line of drugs, chemicals, medicines, paints and oils, druggists' sundries, etc., in the same prompt and enterprising manner as has always distinguished their operations during the past."

Then, after describing their new place of business, the article proceeds:

"The trade needs no introduction to the members of this firm, nor to the methods which have been so long in vogue with it. The junior members of the firm have

long been the active managers of the business, and none are better qualified to conduct it; and the senior, though now past the allotted age of man, is still, 'Ixion-like,' the man at the wheel. Throughout the entire territory in which this firm's business radiates, the trade, in contemplating the important change made, may rest assured that the future of the new house will be fully in keeping with the record of its projectors."

They afterwards caused the same article to be published in the Michigan Tradesman, as "An Announcement to the Drug Trade." That journal is published in the interests of the drug and grocery trades, and has a large circulation. It is claimed that this article had no tendency to confuse the public, or to lead them to believe that the new firm of Farrand, Williams & Clark was a successor to the old firm of Farrand, Williams & Co.; and yet the bill for publishing this very article in the Michigan Tradesman was made out and sent to Farrand, Williams & Co., and came into the possession of the complainants.

The testimony is quite voluminous and very convincing that since the organization of the new firm of Farrand, Williams & Clark a great deal of confusion has been caused by the use of a name so similar to that of the old firm of Farrand, Williams & Co., and that the public has been greatly misled thereby. It was shown that one Halstead had been a customer of Farrand, Williams & Co. for many years. He dealt with Farrand, Williams & Clark after the formation of that firm, and there is no testimony showing that he supposed that this firm of Farrand, Williams & Clark was a successor of the firm of Farrand, Williams & Co. other than the fact that he remitted a draft payable to the order of Farrand, Williams & Co. The defendants received this draft, and indorsed it with the name of Farrand, Williams & Co. A great many other instances of mistakes made in ordering goods or in paying for them appear in the record.

It was also in evidence that the old firm of Farrand, Williams & Co. used a peculiar envelope of a blue color during the entire time the firm existed. Upon this envelope was printed the usual request for return, if not delivered within a certain time, to Farrand, Williams & Co. Very soon after the new firm of Farrand, Williams & Clark organized, they, too, procured and had printed a blue envelope, with a like request for return, printed thereon, to Farrand, Williams & Clark. Mr. Richard P. Williams testified with reference to the selection of envelopes that Mr. Bogart, who was one of the persons who had formerly been in the employ of Farrand, Williams & Co., and Mr. Carver were given directions to get up the stationery, and they brought him a sample of envelopes that they got from somewhere in Detroit, and they had some talk about the color, and Mr. Bogart decided that the blue was the best, and asked his opinion. He replied that blue was good, and would not show dirt. "Bogart said, 'suppose we get some blue,' and I said, 'All right,' and they were gotten." He further testified that when he made the selection it did not occur to him that the firm of Farrand, Williams & Co. had been using an envelope of that color, and he further testified as follows: "But when I came to think of it, and when I heard the old firm objected to it, I saw right off we had made a mistake." The blue envelopes used by the firm of Farrand, Williams & Co. and Farrand, Williams & Clark were made exhibits, and their general appearance is such that the distinction would scarcely be recognized by any one unless his attention was specially called to the names. Mr. Bogart testified that it occurred to him at the time that blue was the color used by Farrand, Williams & Co.

Farrand, Williams & Co. also sold "Brooks' Genuine Dalmatian Insect Powder." The form of the tin box

and style of yellow label were adopted by them. Farrand, Williams & Clark sold "Carver's Strictly Pure Insect Powder.". Samples of each of these were produced, which show a striking similarity. They were identical in size, shape, and color of label, and contained similar arrangement of printing. Bogart selected the boxes and the labels.

Farrand, Williams & Co. had sold for many years "Marseilles Ochre." Farrand, Williams & Clark commenced to sell "Marseilles Ochre." Mr. Williams testified that "it is a name that we put on the brand that we used to sell at Farrand, Williams & Co.'s. We simply adopted it."

In reference to confusion of mail matter, instances without number are given in the testimony where letters addressed to Farrand, Williams & Co. have been delivered to Farrand, Williams & Clark; also where letters and packages have been addressed to Farrand, Williams & Co. at the place of business of the new firm, 32 and 34 Woodward avenue; also where letters have been addressed to Farrand, Williams & Clark, and been intended for Williams, Sheley & Brooks, successors to the old firm of Farrand, Williams & Co.; also where letters directed to Farrand, Williams & Co. were intended for Farrand, Williams & Clark. Mr. Hance, the postmaster at Detroit stated:

"I have had brought to my personal attention between ten and twenty letters addressed Farrand, Williams, and either Co. or Cl.; but the combination, if it was intended for Clark, looked so much like Co. that it might be taken for & Co.   *   *   *   Letters addressed to Farrand, Williams & Co., with the street and number of Farrand, Williams & Clark, would be delivered to Farrand, Williams & Clark; letters addressed to Farrand, Williams & Co., Detroit, Mich., would be delivered to Williams, Sheley & Brooks."

The case of a letter of Glidden & Gage, using an old,

envelope of Farrand, Williams & Co., and simply striking out the old address and inserting the numbers 32 and 34 Woodward avenue, shows that the writer, although intending the letter for Williams, Sheley & Brooks, successors of the old firm, supposed that they had simply changed their address. Mr. Boyce, a druggist of Port Huron, testifies that, although intending to give his business to Farrand, Williams & Co., he was put into communication through the telephone with Farrand, Williams & Clark, and gave it to them, supposing he was giving it to the partners who were continuing the old business at the old place. Letters were received by the firm of Farrand, Williams & Co. at the store of Williams, Sheley & Brooks, directed to Farrand, Williams & Co., which were clearly intended for the firm of Farrand, Williams & Clark. It was also shown that there was a misdelivery of freight brought about by the similarity of names. Large scrap-books were introduced as exhibits in evidence, containing envelopes, letters, bills, statements, etc., in great number, addressed to Farrand, Williams & Co., which were received in due course of mail by complainants, and which were intended for defendants, Farrand, Williams & Clark. Some of these were directed to Farrand, Williams & Co., upon the letter or other matter contained in the envelope; others were addressed to Farrand, Williams & Co. upon the envelope, and Farrand, Williams & Clark inside, that did not relate to the business of the complainants. The testimony shows that well-known Detroit firms fell into error in attempting to distinguish the firms. George Campbell & Sons sent a letter and draft intended for complainants, which fell into the hands of the defendants, although addressed to Farrand, Williams & Co. Similar confusion exists with reference to goods. Goods intended for Williams, Sheley & Brooks, or Farrand, Williams & Co., were sometimes delivered to

Farrand, Williams & Clark. G. & R. McMillan delivered to complainants wines which had never been ordered, and Berry Bros. turpentine, which was afterwards taken to defendants. The Detroit Free Press sent Farrand, Williams & Co., a large bundle of its issue of the day after defendants' answer was filed, and the bill was likewise sent to Farrand, Williams & Co. which was intended for defendants. James Vernor also delivered goods to complainants intended for defendants. A consignment to Farrand, Williams & Co. of glassware from McKee Bros., and of goods from Flora Jones, New York, were received by defendants. Fairbanks' scales came to Farrand, Williams & Co., which had never been ordered. Ten boxes of tissue paper were offered to defendants, though manifested to Farrand, Williams & Co. The same confusion existed of orders through the telephone.

Without citing further instances, with which the testimony abounds, I think the following propositions are conclusively proven:

*First.* The name "Farrand, Williams & Co." was a valuable asset of that firm, its value depending upon the firm's reputation, both as to its goods and credit, as formed by the long years of extensive business.

*Second.* The value of the name "Williams" to the combination of the words "Farrand" and "Williams" was given to the firm by the complainant W. C. Williams by his connection with Mr. Farrand in business, and the name "Farrand, Williams & Co." was to him a very valuable asset.

*Third.* The defendants, wishing to retire from the business, sold voluntarily to the remaining partners, the complainants, who saw fit to remain and continue the business, all their rights and interests in the going business. The interest of the retiring partners was an undivided interest in the joint property, a large part of

which was so indelibly marked with the firm name as to make it valueless unless the vendees had the exclusive right to the use of that firm name. The sale by these retiring partners, therefore, necessarily comprised so much of the good-will as would attach to the goods sold.

*Fourth.* The right to the use of the name "Farrand, Williams & Co." belongs exclusively to the complainants by sale of the business to them; and the right to continue the going business as successors to the firm of Farrand, Williams & Co., and enjoy all the benefits attached to the same in any way, is exclusively the property of the complainants.

*Fifth.* The property sold, aside from the property in the right to the name "Farrand, Williams & Co.," was, at the highest market value put upon it by all parties, worth no more than $200,000. A large part of the property inventoried was worth far less than this sum. Its value depended largely upon the right of the purchasers to use the name "Farrand, Williams & Co.," by reason of the imprint of this name or the initials on a large part of the stock so inventoried. The defendants owned a one-half interest in this property, which by the inventory was valued at $100,000, and the payment of a bonus of $20,000 over and above this half-interest was clearly for the right to use the old name exclusively. There could have been no other consideration for this large sum of money.

That the defendants have adopted the name of Farrand, Williams & Clark is admitted, and they claim the right to do so upon the following proposition:

"Every man has the legal right to engage in any lawful business in his own name, or in connection with others, although by so doing he may interfere with the business of others previously established, and carried on under the same name."

And they claim, further, that no man can be deprived of the absolute right to carry on any legal business in his own name, except by express contract, founded upon a sufficient consideration; that the only limit to this right is that he shall not represent his business to be the business of another, nor the goods which he offers for sale to be the goods of another; in other words, he must not "sail under false colors," or simulate the business of another. The exception stated to the proposition above is quite important in this case, for, in the first instance, the complainants claim that by the contract under which they purchased the business and property of the firm of Farrand, Williams & Co. there was, if not an express, an implied, inhibition against using a name so similar to that of the old firm as would deprive them of the benefits of the property purchased; and they claim further that by the representations made by the defendants to the public, through advertisements, and in simulating the trade-marks and envelopes and packages used by the old firm, they have simulated the business carried on by the complainants.

The defendants refer us, in support of the proposition which they have laid down, to the case of *Turton v. Turton*, 42 Ch. Div. 128. In this case the plaintiffs had for many years carried on the business of steel manufacturers under the name of Thomas Turton & Sons, down to 1886, when a company was organized under the name of Thomas Turton & Sons, Limited. Previous to the organization of the company they had adopted four trademarks, which were transferred to the limited company with all the good-will belonging to the business of Thomas Turton & Sons. Their business had been very extensive. The defendant John Turton had for many years carried on a business similar to that of the plaintiffs in the same town, first as John Turton, and then John Turton &

Co.   In 1888 he took his two sons into partnership, and
continued his business as John Turton & Sons.  It was
shown that the plaintiffs were generally referred to as
Turton & Sons; that their letters and correspondence
were often addressed to them as Turton & Sons, or
Thomas Turton & Sons, without the word "Limited,"
and that checks intended for them were frequently made
payable to the name of Turton & Sons; and it was claimed
that the name adopted by the defendants had led to
confusion between their firm and plaintiffs', and that
persons who intended to give orders to the plaintiffs
would be misled into sending their orders to the defend-
ants.  It was also shown that letters intended for the
plaintiffs had in several instances been delivered to the
defendants, who sent them to the plaintiffs.  Other evi-
dence of confusion of names was produced.  The plaint-
iffs filed a bill asking for an injunction to restrain defend-
ants from carrying on business as merchants, and steel
manufacturers under the name of John Turton & Sons,
or under any style so closely resembling the plaintiffs'
name as to be calculated to deceive.  It was held in that
case that the plaintiffs were not entitled to an injunction;
that the defendants had a right to engage in business,
and carry it on in their own names; and that they were
not responsible for the blunders made by the business
community in not distinguishing John Turton & Sons
from Thomas Turton & Sons.  It was stated by Lord
Esher, M. R., in the course of his opinion, that—

"No man can have the right to represent his goods as
the goods of another person.  Therefore, if a man uses
his own name, that is no *prima facie* case, but if, besides
using his own name, he does other things which show
that he is intending to represent, and is in the point of
fact making his goods represent the goods of another
person, then he is to be prohibited; but not otherwise."

This would be a strong case in favor of the defendants'

position were it not that one important element is lack-
ing to make it a parallel case to this. Thomas Turton
& Sons had no connection in business with John Turton
& Sons. They had never been partners. John Turton &
Sons had never been in partnership with Thomas Turton.
Neither he nor the members of his firm had sold their
interest in the going firm to their partners. These facts
distinguish this case from the one under consideration,
and from those cases which' hold that when partners sell
a going business to another member of the firm, includ-
ing the good-will, they are not at liberty to adopt a name,
in continuing in business further, that is so near in
resemblance to the sound of the old firm name as to
deceive the public, and deprive the purchaser of the
benefits to be derived from purchasing the business and
carrying it on at the old stand. But this case is appli-
cable in one respect, and that is, to that portion of the
complaint which sets forth and insists that the defend-
ants have imitated their labels, envelopes, and packages,
and by their advertisements held themselves out in such
manner as to deceive the public, and lead them to believe
that they are the successors to Farrand, Williams & Co.
In so far as they made their goods to represent the goods
dealt in by complainants, and which they purchased from
the firm, under the authority of Lord Esher they are to
be prohibited.

In *Burgess v. Burgess*, 3 De Gex, M. & G. 896, the
defendant had for many years been employed by the
plaintiff, but he was not a partner. He had not sold the
good-will of the business to the plaintiff, and it was held
that he had a right to start in business at another place
in his own name.

The case of *Meneely v. Meneely*, 62 N. Y. 427, is cited
by the defendants. That was not a case where the
defendants had sold their interest in the partnership to

the plaintiffs, including their good-will; but it was a case where one of the defendants was of the same name as the plaintiffs, the defendants' firm name being Meneely & Kimberly, and they advertised their business under this firm name; the plaintiffs carrying on their business under the name of Andrew Meneely's Sons until 1863, and after that time in the name of E. A. & G. R. Meneely. In deciding the case, Rapallo, J., said:

"If the defendants were using the name of Meneely with the intention of holding themselves out as the successors of Andrew Meneely, and as the proprietors and managers of the old established foundry which was being conducted by the plaintiffs, and thus enticing away the plaintiffs' customers; and if, with that intention, they used the name in such a way as to make it appear to be that of the plaintiffs' firm, or resorted to any artifice to induce the belief that the establishment of the defendants was the same as that of the plaintiffs; and perhaps if, without any fraudulent intent, they had done acts calculated to mislead the public as to the identity of the establishments, and produce injury to the plaintiffs beyond that which resulted from the similarity of name,—then the cases referred to sustain the proposition; not that a court of equity would absolutely restrain the defendant Meneely from the use of his own name in any way or form, but simply that the court would enjoin him from using it in such a way as to deceive the public and injure the plaintiffs. The manner of using the name is all that would be enjoined, not the simple use of it; for every man has the absolute right to use his own name in his own business, even though he may thereby interfere with or injure the business of another person bearing the same name, provided he does not resort to any artifice or contrivance for the purpose of producing the impression that the establishments are identical, or do anything calculated to mislead. Where the only confusion created is that which results from the similarity of names, the courts will not interfere."

The distinction between this case and the one under consideration is quite clear. Here there were not relations between the parties arising out of a partner-

ship, and the selling by retiring partners to the other members of the firm the business of the firm. The principle contended for and decided in this case is not disputed by the complainants. To the same effect are *Cement Co. v. Le Page*, 147 Mass. 206, and *Manufacturing Co. v. Goodyear Rubber Co.*, 128 U. S. 598.

In *Rogers v. Taintor*, 97 Mass. 291, Taintor had become the purchaser of the good-will of an insolvent partnership doing business under the name of J. A. Fay & Co., at Worcester, Mass. He had been a member of the firm. After he so became the purchaser, he used the name of J. A. Fay & Co. in various ways. He attached the name to machines which he sold and sent to foreign countries. He circulated price-lists, with the name printed at the head of the first page, and the same name printed below, with the additional words, "E. C. Taintor, succeeding partner." In deciding the case, Mr. Justice Hoar said:

"We were inclined to the opinion that the sale of the good-will of the business of the Worcester firm of J. A. Fay & Co. to the defendant upon its dissolution in 1861, in which two of the complainants, who had been his partners, joined, would have the effect, as against them, to give him the right to continue to use the name, upon the facts which appear in the case; but, finding the considerations decisive which have been already stated, we do not think it necessary to enter upon that discussion."

We are also referred by the defendants' counsel to the case of *Gilman v. Hunnewell*, 122 Mass. 148. That was not a case where the retiring partners had made a sale of the good-will of the business, but was a case where the plaintiffs had purchased the good-will of the business of John L. Hunnewell, including certain trade-marks, labels, etc. The defendant Edwin Hunnewell had been in the employ of John L. Hunnewell for a long time, and after the sale to the plaintiffs entered into partnership with one John H. Dunbar, and commenced the

same business under the style of Hunnewell & Co. There being no contract relations between the parties, the court held that there did not appear to them to be anything, either in the general appearance or in the contents, the form, the marks, or the arrangement of words of the defendants' labels, which would lead any one using reasonable care and observation to the belief that the defendants' remedy was manufactured by the plaintiffs, or that it was the same medicine as that sold by them; and denied the injunction.

It is insisted on behalf of the defendants that the fact that the parties were once copartners is in no wise material, but I think otherwise. I think the complainants' case rests entirely upon the fact that the parties were once copartners, and that the defendants sold to the other members of the firm the entire business, including a lease of the premises, and the good-will of the business; and that it was to continue as a going concern in the same line of business.

They also contend, which is not disputed, that upon the dissolution of a partnership each partner may re-engage in the same business, and compete with the others; that after dissolution, in the absence of an express agreement, neither can carry on business under the old firm name, unless the firm name be identical with the name of the partner. I do not think that it requires an express agreement to authorize the carrying on of a business under the old firm name. I think such agreement may be implied from the facts and circumstances, at least to the extent of carrying on the business as successors of the old firm.

They also contend that the retiring members of a firm may not only engage in the same business in the same locality, but they may advertise their business, and solicit the customers of the old firm, to the same extent that

other business competitors may do; that they may personally solicit the customers of the old firm. There is no doubt that they may engage in the same business, and in the same locality, and that they may advertise their business; but where they have sold the good-will of the business to the other members of the firm they are precluded from personally soliciting the customers of the old firm.

Counsel for defendants cite the case of *Labouchere v. Dawson*, L. R. 13 Eq. 322. In that case one of the parties had sold his interest in the business, including—

"The good-will of the brewery business hitherto carried on at the premises in Kirkstall, herinbefore mentioned, and the exclusive right to use the name of Benjamin Dawson & Co. in connection with the business of brewers."

After this sale the vendor commenced to carry on the business of a brewer, at another place, and by travelers and agents solicited the customers of the firm of Benjamin Dawson & Co. The court held that the defendant was not at liberty to apply to any of the old customers privately by letter, personally, or by travelers, asking them to continue their custom to the defendant, and not to go to the vendees.

The case of *Pearson v. Pearson*, 27 Ch. Div. 145, is also cited in support of the defendants' contention, and it must be admitted that the majority of the court who gave their opinions in that case went probably to the full extent contended for by the defendants, but it was not an unanimous opinion. Justices Baggallay and Cotton concurred in overruling the case of *Labouchere v. Dawson*, but Lord Justice Lindley stated it to be his opinion that *Labouchere v. Dawson* was rightly decided, and I call attention to what he said upon page 158:

"Although the good-will is not in term mentioned in

the agreement, I think that it is included; for a man who sells all his interest in a business cannot retain any interest in the good-will."

This remark states my view of the agreement in this case, and I wish further to quote from Lord Westbury in *Hall v. Barrows*, 33 Law J. Ch. 204, wherein he said:

"Inasmuch as the defendant, the surviving partner, has by his counsel submitted and agreed to accept and take all the stock belonging to the partnership according to the construction which the court shall put upon the word 'stock', * * * I declare that the words 'stock belonging to the partnership' include and denote the partnership business; * * * also that the exclusive right to use the trade-mark of the partnership is part of the property of the partnership, and ought to be included in the valuation; and that the good-will of the business of the partnership ought also to be valued, and that the same is to be valued on the footing of the surviving partner being at liberty to set up and carry on the same business as the partnership."

The case of *Levy v. Walker*, 10 Ch. Div. 436, supports the same view. There the firm of Charbonnel & Walker had been transacting business under that name, and upon the dissolution of the firm the retiring partner assigned her interest in the business to the other partner, Walker, who continued to carry it on in the same name of Charbonnel & Walker. The retiring partner filed a bill to enjoin the use of the name. Lord Chief Justice James said:

"But there is another point upon which I myself cannot entertain any doubt, which is this: That the assignment of the good-will and business of Charbonnel & Walker did convey the right to use the name of Charbonnel & Walker, and the exclusive right to use that name, as between the vendor and the purchaser of that business. Whether it would prevent another person from afterwards using the name of Charbonnel, I do not say; but the trade-name, made up of parts of two real names, as the master of the rolls says, the trade-name of Charbonnel & Walker (whether it was entirely a fictitious

name can make no difference), was the name of the business, and that business was sold. That was a name with which every article sold might have been impressed; just as in the case of *Millington v. Fox,* 3 Mylne & C. 338, where the name was continued as part of the designation of the article sold. I think it right to say that the sale of the good-will and business conveys the right to the use of the partnership name as a description of the articles sold in that trade, and that that right is an exclusive right as against the person who sold it, and an exclusive right as against all the world, so that no other person could represent himself as carrying on the same business."

Lord Westbury, in the case of *Hall v. Barrows,* above referred to, says:

"But it must be borne in mind that a name, although originally the name of the first maker, may in time become a mere trade-mark or sign of quality, and cease to denote or to be current as indicating that any particular person is the maker. In many cases a name once affixed to a manufactured article continues to be used for generations after the death of the individual who first affixed it. In such cases the name is either accepted on the market as a brand of quality, or it becomes the denomination of the commodity itself, and is no longer a representation that the article is the manufacture of any particular person. * * * This distinction between a name and a trade-mark must be observed. It may be true that, if a name impressed upon a vendible commodity passes current in the market, not as an *indicium* of quality, but simply as a statement or assurance that the commodity has been manufactured by a particular person, the court would not sell and transfer to another person the right to use the name simply and without addition; but if the court sold the business or manufacture carried on by the owner of the name, it would give to the purchaser the right to represent himself as the successor in business of the first maker, and in that character to use the name."

In *Churton v. Douglas,* Johns. Eng. Ch. 174, the defendant, John Douglas, formerly a member of the firm

88 MICH.—35.

of John Douglas & Co., had sold all his share in the good-will of the partnership to the plaintiffs, who were his former partners. He was restrained from using the firm name of John Douglas & Co., although his own name was John Douglas, and he was associated in partnership with others; and the vice-chancellor went on to say that, if the old firm name had been merely "John Douglas," and there had been a sale, by the individual of that name, of all his share in the good-will of the firm, "and he had secured the three managing men in the former business, and was going, as here, to set up the old firm of John Douglas with these three men, * * * * I should hold then, as I hold now, that he was not at liberty to trade under such a misrepresentation." And the vice-chancellor, in deciding that case, further said:

"When you are parting with the good-will of a business, you mean to part with all that good disposition which customers entertain towards the house of business identified by the particular name or firm, and which may induce them to continue giving their custom to it."

Upon the same principle as that announced in *Churton v. Douglas*, it was held in *Rodgers v. Nowill*, 3 De Gex, M. & G. 614, that defendants' firm, composed of John and William Nowill and William Rodgers, had no right to use upon articles of cutlery manufactured by them the name or mark "J. Rodgers & Sons," with the crown and the royal initials following it. This was a case where the defendants were restrained from using a firm name so near like that of the plaintiffs that it would be apt to mislead the public, although the defendants' firm name included the actual name of one of the members of the firm.

In the case of *Burckhardt v. Burckhardt*,[1] 36 Ohio St. 261, by the agreement the property, including the good-will, was required to be put up, bid off, and sold as a "going concern" to the highest bidder of the partners. The defendant became the purchaser, and plaintiff gave the defendant the exclusive possession of the concern, and conveyed and transferred to him the property purchased. The consideration was entire for all that was purchased, and there was no separation, in the contemplation of the parties, of the good-will from the other property. The court held that the good-will of the concern passed to the purchaser, and that he was entitled to his damages for the injuries sustained by him in being deprived thereof. The old firm had been conducting business under the firm name of Burckhardt & Co. The agreement reserved the right for the plaintiff to engage in business in his own name, but he agreed that he would not engage in business under the firm name. He assumed the name of Leopold Burckhardt & Co., and advertised his business in such a manner as to lead the customers of the old firm to believe that he was carrying on the business, and he solicited their customers by letters, circulars, and agents or traveling salesmen. He also hired the salesmen who had been employed by the old firm to sell his goods, and he engaged in the same kind of business that the old firm had been engaged in. The court held that he was liable for the actual damages which he had caused to the extent to which he had obtained the old customers of the firm to cease trading with it, and to trade with him; in other words, to the extent to which he had obtained a transfer of their patronage.

---

[1] This case was a foreclosure suit, in which the defendant filed a counter-claim for being deprived of the good-will of the old business.

It has been held that the good-will of a business is the subject of sale, like other personal property. *Churton v. Douglas,* Johns. Eng. Ch. 174; *Banks v. Gibson,* 11 Jur. (N. S.) 680; *Hitchcock v. Coker,* 6 Adol. & E. 438; *Wedderburn v. Wedderburn,* 22 Beav. 84; *Johnson v. Helleley,* 34 Id. 63; *Bradbury v. Dickens,* 27 Id. 53; *Mellersh v. Keen,* 28 Id. 453; *Turner v. Major,* 3 Giff. 442; *Cruttwell v. Lye,* 17 Ves. 335; *Shackle v. Baker,* 14 Id. 468; *Hall v. Barrows,* 33 Law J. Ch. 204; *McFarland v. Stewart,* 2 Watts, 111; *Holden's Adm'rs v. McMakin,* 1 Pars. Eq. Cas. 270; *Musselman's Appeal,* 62 Penn. St. 81; *Williams v. Wilson,* 4 Sandf. Ch. 379; *Dougherty v. VanNostrand,* 1 Hoff. Ch. 68. It may be bequeathed by will. *Hitchcock v. Coker,* 6 Adol. & E. 438; *Smith v. Everett,* 27 Beav. 446. It will pass under a creditor's deed, by which the separate estate of the partners, as well as the firm's assets, is conveyed to trustees. *Bury v. Bedford,* 4 De Gex, J. &. S. 352. It is an asset of the copartnership. *Macdonald v. Richardson,* 1 Giff. 81; *Banks v. Gibson,* 11 Jur. (N. S.) 680; *Austen v. Boys,* 2 De Gex, & J. 626; *Willett v. Blanford,* 1 Hare, 271; *Musselman's Appeal,* 62 Penn. St. 81; *Crawshay v. Collins,* 15 Ves. 218; *Mellersh v. Keen,* 27 Beav. 236, and 28 Id. 453. These authorities establish the proposition that the good-will, as well as the trade-marks and trade-name, is property which is entitled to the protection of a court of equity.

Other authorities sustaining the contention of the complainants are found in the following cases: *Myers v. Buggy Co.,* 54 Mich. 215; *Grow v. Seligman,* 47 Id. 607; *Mogford v. Courtenay,* 45 Law T. (N. S.) 303; Kerr, Inj. 167 *et seq.*; High, Inj. § 822; Bates, Partn. §§ 570, 663, 669, 672; *Gage v. Publishing Co.,* 11 Ont. App. 402; *Merry v. Hoopes,* 111 N. Y. 415; *Hoxie v. Chaney,* 143 Mass. 592; *Shipwright v. Clements,* 19 Wkly. Rep. 599;

*Holmes v. Manufacturing Co.*, 37 Conn. 278; *Cement Co. v. Le Page*, 147 Mass. 206; Lindley, Partn. 439; *Hall's Appeal*, 60 Penn. St. 462; Colly. Partn. §§ 162, 168; *Shaver v. Shaver*, 54 Iowa, 208 (6 N. W. Rep. 188); *Liggett & Myers Tobacco Co. v. Sam Reid Tobacco Co.*, 104 Mo. 53 (15 S. W. Rep. 843). The complainants' case may be safely rested upon the principles recognized and acted upon in *Myers v. Buggy Co.*, above cited.

The record in this case is voluminous, and this opinion has already been drawn out to greater length than I intended; but whoever will take the trouble to read the proofs will find that a plain case for equitable relief is made out under well-recognized principles of equitable jurisdiction.

The complainants are entitled substantially to the relief prayed for, and the decree of the court below should be reversed, and a decree entered here in accordance with the prayer of the bill.