## EXTENT TO WHICH COMPETITION MAY BE CARRIED ON BY A VENDOR OF GOOD WILL.

· Superior Court of Cincinnati.

THE CROWN OVERALL MANUFACTURING COMPANY V. THE LEVY OVERALL MANUFACTURING COMPANY ET AL.

Decided, December 5, 1914.

*Good Will—Restrictions on a Vendor Organizing a Competing Business— Notwithstanding the Absence of a Stipulation Not to Re-engage in a Similar Business—Injunction Against Inducing Employees of the Old Concern to Take Employment with the Competing Business.*    .

1. The vendor of the good will of a business, while retaining, in the absence of an express stipulation to the contrary, the right to re-engage in a similar business, may not directly solicit business from known customers of the old firm, and an attempt on his part to do so will be enjoined by a court of equity.
2. Where the vendee of the good will organizes a corporation and transfers thereto all his right, title and interest in and to the property and good will of the old concern, the right which is by law conferred upon him to prevent interference with former customers devolves upon the newly organized corporation and may be enforced by it; and where the vendor of such good will thereafter organizes a corporation which engages in a similar business, such newly organized corporation will be bound by the same obligations with reference to such interference as those which devolved upon the vendor.
3. The vendor of the good will of a business will be enjoined from endeavoring to induce former employees of such business to leave its employ and to join him in a competing business.

*Judson Harmon* and *Oscar A. Berman,* for plaintiff.

*Lawrence Maxwell, Jos. S. Graydon* and *Cohen, Mack & Hurtig,* contra.

OPPENHEIMER, J.

About eleven years ago Oscar Berman and Samuel Levy formed a partnership under the firm name of Berman & Levy

for the manufacture and sale of overalls. The business, which was generally conducted under the name of the Crown Overall Company, grew apace, until during the year 1913 the gross sales aggregated nearly $1,000,000. On or about the 20th day of December, 1913, the partnership was dissolved by mutual consent, Berman buying the interest of Levy, and paying therefor the sum of $115,000. Of this sum $15,000 was understood to represent the value of Levy's interest in the good-will, and the bill of sale which was executed by Levy at that time recited that he conveyed to Berman "the good-will of said partnership and all other property and assets of every kind and nature whatsoever." The sum of $15,000 was paid to Levy in cash at the time of the transfer, and the balance of $100,000 was, by agreement, to be paid in weekly installments of $2,000 each, and was evidenced by notes which were to be secured by stock in a new corporation to be organized by Berman. Shortly after the transfer was made, the plaintiff company was organized by Berman, who transferred to it all the property and good-will owned and acquired by him. In consideration of such transfer, Berman received stock of the plaintiff corporation, which he now holds.

Some time thereafter Levy organized the defendant corporation, with himself as president and chief stock-holder, and this corporation is now engaged in the same business as that in which plaintiff corporation has been engaged.

The firm of Berman & Levy had, during practically all of its existence, employed three methods of soliciting business. The first method was that of sending to various retail dealers in the western part of the country samples which were to be paid for if retained by them. The second method was that of solicitation through traveling salesmen in the states of the Mississippi valley. The third method was that of sending advertising matter to proposed customers. These methods of securing business were followed by the plaintiff corporation. Shortly after the defendant corporation was organized, the same methods of solicitation were adopted by it. The principal question which is

now presented to us for our consideration concerns defendant's right, by the methods thus indicated, to solicit customers of the old firm of Berman & Levy. Before answering this question, it will be well to review a portion of the testimony with a view to determining whether defendant's methods were those of fair, legitimate competition, or of deliberate, wilful and improper interference.

Among plaintiff's employees was one Harry Hoemmelle, who had been employed as a draughtsman and cutter for more than five years. He was induced by defendant Levy to leave plaintiff's employ and to enter the employ of defendant. Various witnesses testify that prior to the time when he severed his connection with plaintiff's company, he made measures of patterns belonging to it, and noted these measurements in a memorandum book which he retained in his possession. Hoemmelle did not take the witness stand to deny these allegations. The result of his work is apparent from the fact that the overalls produced by the defendant company and designed by Hommelle are in manifest imitation of plaintiff's product. It is quite true that the designs for these overalls are neither copyrighted nor patented, nor is it contended that defendant may not produce overalls which are similar in appearance to those which are manufactured by plaintiff. But the fact of conscious and deliberate imitation is a circumstance which reflects pertinently upon the fairness of defendant's competition, when samples are sent directly to those who must have been known to defendant to be customers of plaintiff. Moreover, the testimony indicates that when defendant desired to have circulars printed for advertising purposes, it sent for the printer who had originally furnished the circulars used by the old concern, and made inquiry concerning the prices of circulars substantially like those which were used by plaintiff. And the circulars which were ultimately prepared for defendant's use were similar in all respects to those which plaintiff had used. There could not have been even as much excuse for this as for the imitation of overalls, for manifestly no economy was effected by such simulation excepting in mental effort.

The testimony further shows that printed order blanks were sent out with the circulars. In the printing of these blanks, the very electrotypes which had been bought, paid for and used by plaintiff, were, at defendant's request, employed by the printer. No more patent effort to appropriate the fruits of another's brain can be conceived. Levy's explanation that he himself had assisted in preparing these order blanks. is answered by the statement that so far as they had become the property of the old firm of Berman & Levy, he had parted with all rights in them, and received compensation therefor. He can scarcely be permitted both to "eat his cake and have it too."

The impression which defendant desired to convey to plaintiff's customers to whom such samples and printed matter were sent, can readily be conceived. Defendant, however, contends that there was no misrepresentation that it had succeeded to plaintiff's business and no imitation of the buttons, tickets or other marks upon the overalls. The truth of such contention is more apparent than real. The lot numbers employed by defendant were in most cases similar to or identical with the lot numbers which plaintiff had continuously used. The garment tickets which were attached to the overalls made by defendant are suspiciously similar in color to those employed by plaintiff to designate lots of similar numbers. It is more than passing strange that with all the colors of the rainbow from which to choose, defendant should have selected blue, or a combination of blue and red, for tickets to place upon overalls strikingly similar to plaintiff's product upon which tickets of the same color were used. And when all these facts are considered in connection with the subscription of Samuel Levy's name to letters which were sent to former customers of plaintiff, the conclusion is inevitable that a studious effort was being made to induce the belief that defendant's overalls were proper substitutes for those previously made and sold by plaintiff and by the firm of Berman & Levy. We are aware that under present economic conditions it is the purpose of the law to foster competition. Acting upon this principle

Congress has enacted the Sherman Anti-Trust law, and the General Assembly of this state has passed the Valentine act. But the competition thus fostered and encouraged must be legitimate. With the unfolding of our social conscience, the ethical standard in the business world is being elevated.

We are demanding honesty of method and integrity of purpose in our industrial life. Misrepresentation and fraud elicit public condemnation. One who seeks to gain the confidence of the people must offer as a foundation for such confidence the merit of his own product and the honesty of his own methods. He can not in good conscience offer as his own that which he has not himself produced and which he has obtained by unconscionable means from those whose wares he seeks to displace. He can not reap where he has not sown, nor earn his profits in the sweat of another's brow. It is perfectly apparent that defendant's methods are reprehensible, and that plaintiff is entitled to an injunction which will prevent the unfair competition in which defendant is engaged.

We are, however, asked to take a broader view of the situation and to enjoin generally the solicitation of customers of the old concern by the defendant company, its officers, agents and employees. That is to say, we are requested to treat this case not merely as one of unfair trade competition, but as one in which defendant is violating contractual rights which arise by necessary implication out of the sale of Levy's interest in the good-will of the firm of Berman & Levy. The chief contest in this case has been waged about this point, and it thus becomes necessary for us to consider the Ohio law upon the subject.

As heretofore stated, Levy sold to Berman his interest in the good-will of their joint business. Good-will may be defined as the favorable reputation which a business has established, resulting in a disposition of people to patronize such business, and in the consequent probability that the business will retain its established custom and ultimately enlarge it. In other words, it is the advantage which attaches to an established business by reason of the fact that it has regular customers whose needs

are supplied by it and whose confidence it has been able to secure.

Now it appears to be uniformly held in this country that the vendor of the good-will of a business may, in the absence of any agreement to the contrary, engage in a similar business in the same locality.   He may advertise in such manner as he sees fit, and may deal without restriction with those who come to him as a result of such advertisement.   But this is not tantamount to saying that he may, after selling his interest in the good-will and receiving adequate consideration therefor, solicit those who have been customers of the old concern and thus seek voluntarily to diminish the value of that which he has sold.

Curiously enough, the leading case in this state arose in this court, and counsel in the case at bar were intimately concerned with its disposition.   The leading counsel for plaintiff then sat upon this bench and participated in the decision, and the leading counsel for defendant represented one of the parties litigant.   The case is that of *Burkhardt* v. *Burkhardt,* reported for the first time in 5 O. D. Rep., 185.   The court says, at page 193:

"The good-will of a business is a probability or chance that the customers of the old firm will choose and continue to deal with the successor, and that from such advantage it will increase its business with the growth of the community.

"From this it is clear that nobody owns such customers; that they may purchase and sell and deal where and with whom they choose; and if the person selling such good-will has done nothing to induce them to come to him, beyond making the fact generally known that he is carrying on such business, and where he carries on the same, or if he does nothing to keep them in ignorance of the fact that he has sold such good-will, he may deal with them without subjecting himself to any legal or equitable claims, by the person to whom he has sold such good-will. It is the mere probability or chance of the old customers choosing to continue to deal with him, that the purchaser of the good-will buys; and if they do not so choose he has no legal grounds of complaint.

"But it by no means follows that such seller of the good-will, when he again engages in the same kind of business, in the same place, may rightfully do all that any other merchant may in competing with the old firm for the old business.   He has sold

something and been paid for it, other traders have not. He is either bound to observe some line of conduct different from an ordinary merchant, or he will be getting something for nothing. He must relinquish some rights and privileges with regard to the old trade, or the promise to pay him for it is without consideration, and would not be enforcible on that account. But good-will, though intangible, is property, and often valuable property—it is the very atmosphere that envelopes and pervades a business and that gives it the breath of life.

"Our conclusion is that a person selling such good-will and rightfully engaging again in such business, may advertise the fact to all the world and invite it to come and deal with him; but that he must refrain from specially applying to and urging and holding out special and designed inducements to the customers of the old firm to leave it and deal with himself. That tends directly to destroy or take away the chance or probability which he has sold and for which he has been paid. As to that he must be *passive*, except as we have stated above, and act in perfect good faith toward the house to which he has sold such good-will."

The judgment of this court just referred to was reversed in 36 O. S., 261, but the principle with which we are here concerned was left entirely undisturbed. The reversal was upon the sole ground that there had been error in calculating a separate value for the good-will and in fixing the damages to which the plaintiff was entitled. The case was again tried before this court and reported in 8 O. D. Rep., p. 496. The court says (pp. 497-8):

"Some things, however, have been definitely settled, and among others, that the vendor, in the absence of any covenant to the contrary, may carry on a similar business, and may deal with the old customers, *provided he does not solicit their trade.*"

And the court then proceeds to explain that plaintiff's right to damages is based solely upon the fact that defendant had solicited customers of the old concern. The court uses the expression, "it is not solicitation, but successful solicitation, that gives damages," and this expression is approved by the Supreme Court in the next report of the case in 42 O. S., 474. It is apparent that if it is successful solicitation which creates the right

to damage, then successful solicitation is violative of the vendee's legal rights. And as all solicitation is intended to be successful, it follows that all solicitation is forbidden. The very measure of damages fixed by the Supreme Court—the difference in value between good-will without and with solicitation, indicates conclusively the illegality of solicitation.

In the case of *Moody* v. *Thomas,* 1 Disney, 294, decided by this court in general term in 1857, the court says (pp. 298-9):

"There being no stipulation to the contrary between the parties, either express or implied from their conduct at the time of sale, the retiring partner was under no legal obligation to cease from business altogether, nor yet to induce or prevail upon the old customers of the establishment to continue to deal at the old place. He ought not, in good faith, directly to interfere with the customers of his vendee, but he is not bound to do anything more."

In the case of *Richardson* v. *Westjohn,* 6 O. D. Rep., 1043, decided by this court in general term in 1881, it is said:

"In the time of Lord Eldon, good-will was restricted to a mere right to be a successor of the old firm, and nothing was an infringement of it but a representation by an unauthorized person that he represented the old firm. But now the law is, as stated by Sir George Jessel, that where a man has sold a thing, the seller has no right to take back that thing which he has sold and been paid for; and therefore, where an establishment with the stand and good-will has been sold, if the seller undertakes to solicit and draw away from the old firm the established customers of that firm, he is trying to take back to himself the thing which he has sold and been paid for."

But counsel for defendant contend that the rule thus apparently established by the Ohio decisions has been subverted by the Supreme Court in the case of *Brass Works* v. *Payne,* 50 O. S., 115. It would, indeed, be strange if a deliberate decision of that court were overruled in a case in which the same question was not even involved. A careful examination of the Payne case will conclusively indicate that the question now presented for our consideration was not then at issue. The case was one

of unfair trade competition by the use of a trade name which worked an injury to plaintiff. The court specifically states (p. 117) that "the single question of law presented by the record is whether or not where a partnership is dissolved, one partner transferring to the others all his interest in the firm business and assets, with the understanding that the others are to succeed to the business of the old firm and carry it on at the old stand, but not to use the old firm name beyond a specified time, the retiring member can lawfully use that name in a similar business thereafter carried on by him in the vicinity." The case can not be said to decide anything except "the single question of law" presented to the court; and the gratuitous statements concerning the rights of one who has "parted with his interest in the firm name only," however worthy of our respect, can not offer a safe guide to the perplexed. They can only point the futility of *obiter dicta.* Moreover, the statements thus referred to were apparently predicated upon the decision in the case of *Pearson* v. *Pearson,* 27 Ch. Div., 145, which was subsequently overruled in the case of *Trego* v. *Hunt,* 1896 App. Cas., 7.

We are therefore of opinion that the law of this state requires us to hold that one who disposes of the good-will of a business and receives adequate compensation therefor, bars himself from thereafter soliciting customers of that business and thus diminishing or destroying the value of that which he sells.

We shall also examine a few of the decisions in other jurisdictions in order to ascertain whether they are in accord with that which we believe to be the Ohio rule. One of the most recent of these is the case of *Von Bremen* v. *MacMonnies,* 200 N. Y., 41. The second syllabus reads:

"A purchaser for a valuable consideration, on a voluntary sale of the good-will of the business of a firm, may enjoin former members thereof from soliciting business from the customers of the old firm."

A valuable note is appended to this case in 21 A. & E. Ann. Cas., 423, in which the subject now before us is treated at great length.

The same rule is laid down in the case of *Ranft* v. *Reimers*, 200 Ills., 386, where it is held that a seller who conveys and warrants the good-will of a business may be enjoined from soliciting old customers upon re-engaging in the same business.

In the case of *Zanturjian* v. *Borrnazian*, 25 R. I., 151, it was likewise held that the vendor of the good-will of a business, while retaining the right to re-engage in a similar business in the same neighborhood, has no right to attempt to secure the patronage of the old customers, or to induce them not to deal with the vendee.

In the case of *Gregory* v. *Spieker*, 110 Cal., 150, which presents some rather close analogies to the case at bar, it was held that the manufacturer of a patent medicine, who sold all his right, title and good-will thereto, would be enjoined from manufacturing and vending a similar compound under an entirely different name, and representing it to be superior to the original medicine.

In the case of *Fairchild* v. *Lowry*, 207 Mass., 552, it was held that a person who has been carrying on an insurance business, and who sells the business without agreeing not again to engage therein, though he may thereafter pursue the same vocation and use his own name, may not derogate from the effect of the sale by soliciting business from former customers.

In the case of *Althen* v. *Vreeland*, 36 Atl. (N. J. Chanc.), 479, it was held that a person who sells his interest in the property and good-will of a firm will be restrained, on engaging in a rival business, from soliciting customers of the firm to deal with him or not to deal with the purchaser. The court says (p. 481):

"This doctrine is put upon the ground that these acts are direct and intentional dealings with the good-will sold, and efforts to destroy it, in which the vendor takes advantage of the business connection of the old firm, and his knowledge of that connection."

The same question came again before the same court in the case of *Snyder* v. *Burton*, 80 N. J. Eq., 185, and it was again

held that a person who has sold the good-will of a business may, unless he has otherwise covenanted, set up a rival business, but that he may not solicit the custom of those who have previously dealt with him.

In the case of *Acker, Merrall & Condit Co.* v. *McGaw*, 144 Fed., 846, it was likewise held that one who sold and transferred the good-will of a mercantile business would be enjoined from attempting to entice away employees or solicit customers who were such at the time of the sale to trade with the competing firm organized by him. The court says (p. 865):

"It would be a reproach to the law if no adequate remedy could be afforded for the protection of a property so valuable as such a good-will against the vendor who has sold it, and who afterwards attempts to regain it to the damage of his vendee.

"As the continued patronage of the customers of such a business is what makes the good-will of value, and as it is utterly repugnant to the contract by which it was assigned that the vendor should be allowed to seek to regain it by soliciting the customers to come back to him, and as the damage thus inflicted is irreparable * * * I think a court of equity should not hesitate to grant a remedy by injunction."

The same principle is applied in the case of *Myers* v. *Tuttle*, 183 Fed., 235.

The leading case in England is that of *Trego* v. *Hunt, supra.* This case was decided in the House of Lords on December 5th, 1895; and as many of the very recent cases in this country are expressly predicated upon this decision, we shall quote from it at some length. It was held that where the good-will of a business is sold, without further provision, the vendor may set up a rival business; but he is not entitled to canvass the customers of the old firm, and may be restrained by injunction from soliciting any person who was a customer of the old firm prior to the sale to continue to deal with the vendor and not with the purchaser. The House of Lords reviews all the preceding cases, including that of *Pearson* v. *Pearson, supra,* which is expressly reversed. Lord Herschell, delivering the principal opinion, says (pp. 20, 21):

"I think it must be treated as settled that whenever the good-will of a business is sold the vendor does not, by reason only of that sale, come under the restriction not to carry on a competing business. * * * It does not seem to me to follow that because a man may, by his acts, invite all men to deal with him, and so, amongst the rest of mankind, invite the former customers of the firm, he may use the knowledge which he has acquired of what persons were customers of the old firm in order, by an appeal to them to seek to weaken their habit of dealing where they have dealt before, or whatever else binds them to the old business, and so to secure their custom for himself. This seems to me to be a direct and intentional dealing with the good-will and an endeavor to destroy it. * * * It is true that those who were former customers of the firm to which he belonged may of their own accord transfer their custom to him; but this incidental advantage is unavoidable, and does not result from any act of his. He only conducts his business in precisely the same way as he would if he had never been a member of the firm to which he previously belonged. But when he specifically and directly appeals to those who were customers of the previous firm he seeks to take advantage of the connection previously formed by his old firm, and of the knowledge of that connection which he has acquired previously, to take that which constitutes the good-will away from the person to whom it has been sold and to restore it to himself. * * * It is not material to consider whether, on the sale of a good-will, the obligation on the part of the vendor to refrain from canvassing the customers is to be regarded as based on the principle that he is not entitled to depreciate what he has sold, or as arising from an implied contract to abstain from any act intended to deprive the purchaser of that which has been sold to him and to restore it to the vendor. I am satisfied that the obligation exists, and ought to be enforced by a court of equity."

Lord MacNaghten reading a concurring opinion says (pp. 24, 25):

"Often it happens that the good-will is the very sap and life of the business, without which the business would yield little or no fruit. It is the whole advantage, whatever it may be, of the reputation and connection of the firm, which may have been built up by years of honest work or gained by lavish expenditure of money. * * * He (the vendor) may do everything that a stranger to the business, in ordinary course, would be in a position to do. He may set up where he will. He may push his

wares as much as he pleases.  He may thus interfere with the custom of his neighbor as a stranger and an outsider might do; but he must not, I think, avail himself of his special knowledge of the old customers to regain, without consideration, that which he has parted with for value.  He must not make his approaches from the vantage ground of his former position, moving under cover of a connection which is no longer his.  He may not sell the custom and steal away the customers in that fashion.  That, at all events, is opposed to the common understanding of mankind and the rudiments of commercial morality, and is not I think to be excused by any maxim of public policy.  *  *  *  A man may not derogate from his own grant; the vendor is not at liberty to destroy or depreciate the thing which he has sold; there is an implied covenant, on the sale of the good-will, that the vendor does not solicit the custom which he has parted with; it would be a fraud on the contract to do so.  *  *  *  It is not right to profess and to purport to sell that which you do not mean the purchaser to have; it is not an honest thing to pocket the price and then to recapture the subject of sale, to decoy it away or call it back before the purchaser has had time to attach it to himself and make it his very own.''

Defendant attaches much weight to the opinion of the Supreme Court of Michigan in the case of *Williams* v. *Farrand,* 88 Mich., 473.  In that case there was no grant of the good-will *eo nomine.*  Indeed, the vendors of their interest in the old business specifically refused to execute the bill of sale which was originally drawn, because it purported to include the good-will.  The court practically follows the narrow interpretation of good-will as given by Lord Eldon in *Cruttwell* v. *Lye,* 17 Ves. Jr., 335.  The court likewise relies largely upon the English case of *Pearson* v. *Pearson, supra,* which has since been overruled.  The lengthy dissenting opinion of Chief Justice Champlin, citing, among other cases, *Burkhardt* v. *Burkhardt,* seems to arrive at a far more logical and just result than the majority opinion.  Moreover, the fact that the Burkhardt case is relied upon by the chief justice as supporting his view indicates that he has interpreted it as we are interpreting it now.

A number of other decisions have been cited by counsel for the defendant, but we think that in most cases they merely support

the general proposition which we admit to be true, that the vendor of the good-will may enter into an opposition business and solicit trade generally.   In some of the cases, however, as for instance that of *MacMartin* v. *Stevens*, 37 Wash., 616, a view contrary to ours is taken.   In the last case the court refused to follow the Ohio rule, though counsel for appellants cited the Burkhardt and Richardson cases to which we have already referred.   But even in that case we do not understand that the court sanctioned deliberate interference with the patrons of the former business.

We are, then, of opinion that defendant Levy, having sold to Berman his interest in the good-will of the business theretofore conducted by both of them jointly, should be restrained from soliciting the customers of the old concern either by sending samples to them, by having salesmen call upon them, or by sending advertising matter directly to them.

We do not think that the rights of the parties are in any way affected by the fact that Berman has transferred the business and good will owned by him to the plaintiff corporation, or that defendant Levy subsequently organized defendant corporation, in whose name the acts complained of are being done.   We do not believe that any subterfuge should be permitted, the result of which would be to deprive the vendee of the rights which he would otherwise have.   *Peterson* v. *Schmidt*, 13 C. C., 205; *Snyder* v. *Burton*, *supra;* *Southworth* v. *Davison*, 106 Minn., 119; *Acker, Merrall & Condit Co.* v. *McGaw, supra;* *Von Bremen* v. *MacMonnies, supra;* *Myers* v. *Buggy Co.*, 54 Mich., 215.

Accordingly it is our opinion that when Berman transferred to the plaintiff corporation the business theretofore conducted in the name of the Crown Overall Company, he divested himself of all rights in the good-will and conferred those rights upon the corporation, by which they may now be enforced. Levy manifestly knew that the corporation was to be formed by Berman, because the deferred payments to be made to him by Berman were to be secured by a pledge of the stock of such corporation.   Conversely, when Levy organized the defendant corporation, he could transfer to it only those rights which he himself then had; and as he had already divested himself of the

right to solicit former customers, it would be a mere mockery of justice to authorize the corporation in which he holds the controlling interest to do that which he himself may not do.

We are next to determine to what extent the injunction may affect the employees of the defendant corporation who are named as defendant. So far as Hoemmelle is concerned, his actions are beyond question unconscionable, and we shall not waste time in citing cases which uphold the power of a court of equity to prevent the disclosure or use of trade secrets. He gained his information while in the employ of plaintiff company. He has pirated plaintiff's patterns, and he must be enjoined from making use of knowledge gained in that manner. There has thus far been no testimony which indicates that Margaret Walker or Isador Schifrin have divulged any trade secrets or done any other acts which, so far as they may be the subject of injunction, will not be amply covered by the general decree which may be entered in the case.

The testimony indicates that when Levy severed his connection with the old concern, the employees presented him with some sort of testimonial. For the alleged purpose of expressing his gratitude in letters to be sent to each of them, he obtained a list of employees. No such individual letters were, however, sent. Levy admits that he made an offer to pay a larger salary to any of the employees of the old firm who would leave it and come to him. The connection between this offer and the list of names thus obtained is quite apparent. While we do not desire to place ourselves in the attitude of preventing working people from bettering their economic condition by seeking the most profitable market in which to sell their labor, yet Levy's action in this regard is likewise an interference with the business of plaintiff with which he had impliedly agreed not to interfere. The seller of the good-will of a business has no right to endeavor to induce employees of the old concern to leave its employ and join him in a competing business.

Defendant finally contends that as no list of plaintiff's customers has been furnished, it can not be enjoined from soliciting plaintiff's trade provided no effort is made to concentrate upon those customers. The testimony indicates that defendant Levy

was, during the ten years of his connection with the old concern, engaged in looking after all credits, collections, orders, tracers and freight, and that he had access to all lists of customers, and that he met those who personally called at its place of business. It would be strange then if he did not know who plaintiff's customers were. Moreover, David Levy, one of the defendants, had been in charge of the shipping and stock rooms of the old firm. According to the testimony, he had boasted of his ability to get all the customers from the old firm by sending letters to them and he never took the stand to deny this allegation. Indeed, Levy himself is said to have remarked that he could obtain a list of the old customers by going through Dun's Agency book and checking them off, and he made no denial of this statement. Under such circumstances we are of opinion that defendant should continue to deal with plaintiff's customers at its own peril, that it is bound to know who those customers are and to refrain from soliciting their trade. Defendant's counsel has suggested that such an order will ruin the business of defendant; but if its business is founded upon an immoral basis, or conducted in an unconscionable way, it is more just for us to disregard the results which such an order may cause to defendant's business than to disregard plaintiff's rights and permit their continued infringement by defendant.

We are therefore of opinion that defendant company should be enjoined from soliciting the patronage of former customers of the firm of Berman & Levy, from continuing to deal with the former customers whose business has been secured by such solicitation, from using printed matter in manifest imitation of that now or formerly employed by plaintiff company, from copying plaintiff's patterns and from otherwise interfering with the rights which were transferred to Berman by the sale to him of the interest of Samuel Levy in the property and goodwill of Berman & Levy. While it is true that this case has thus far been heard only upon a motion for a temporary restraining order, yet it is our intention that this opinion shall cover as upon a final hearing the points already mentioned. There may, of course, be such further hearing as may be necessary to present any other questions raised by the pleadings.